NO. 11-15620-F

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT**

_____

**FABIO OCHOA,**
                              *Petitioner/appellant,*

**v.**

**UNITED STATES OF AMERICA,**
                              *Respondent/appellee.*

_____

**On Appeal from the United States District Court
for the Southern District of Florida**

_____

**CERTIFICATE OF INTERESTED PERSONS**

_____

**RICHARD C. KLUGH, ESQ.**          **TODD G. SCHER, ESQ.**
**Counsel for Appellant**                **Counsel for Appellant**
**Ingraham Building**                    **Law Office of Todd G. Scher, P.L.**
**25 S.E. 2nd Avenue, Suite 1105**       **398 E. Dania Beach Boulevard Suite 300**
**Miami, Florida 33131-1605**            **Dania Beach, Florida 33004**
**Tel. No. (305) 536-1191**              **Tel. No. (754) 263-2349**

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

### Fabio Ochoa v. United States
### Case No. 11-15620-F

Appellant, Fabio Ochoa, files this Certificate of Interested Persons and Corporate Disclosure Statement, listing the parties and entities interested in this appeal, as required by 11th Cir. R. 26.1.

Aldazabal, Mauricio

American Civil Liberties Union of Florida, Inc.

Bergendahl, John

Bergonzoli, Nicholas

Black, Roy

Blue, John

Cardena, Carlos

Castiblanco, Jaime

Del Toro, Ricardo

Docobo, Richard

Dominguez, Humberto

Ferrer, Wifredo

Forman, Daniel

*Ochoa v. United States*
Case No. 11-15620

Garber, Hon. Barry

Gonzalez, Manuel

Klugh, Richard C.

Lewis, Neal R.

Marshall, Randall C.

Matters, Michael

McLaughlin, James A.

Moore, Hon. K. Michael Moore

Ochoa, Freddy Ivan

Perdomo, Sergio

Perez, Joaquin

Perczek, Jackie

Petruzzi, Paul

Ramsey, Rachael

Ryan, Edward

Scher, Todd

Schultz, Anne

*Ochoa v. United States*
Case No. 11-15620

Smachetti, Emily M.

Srebnick, Howard

Strafer, Richard

Sutton, Stacey

Toro, Maurucio

Santiago Velez

Walbolt, Esq., Sylvia

Walsh, Michelle

Monica S. Wetzel

C-3 of 3

NO. 11-15620-F

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

FABIO OCHOA,
*Petitioner/appellant,*

v.

UNITED STATES OF AMERICA,
*Respondent/appellee.*

On Appeal from the United States District Court
for the Southern District of Florida

MOTION FOR CERTIFICATE OF APPEALABILITY

**RICHARD C. KLUGH, ESQ.**
**Counsel for Appellant**
**Ingraham Building**
**25 S.E. 2nd Avenue, Suite 1105**
**Miami, Florida 33131-1605**
**Tel. No. (305) 536-1191**

**TODD G. SCHER, ESQ.**
**Counsel for Appellant**
**Law Office of Todd G. Scher, P.L.**
**398 E. Dania Beach Boulevard Suite 300**
**Dania Beach, Florida 33004**
**Tel. No. (754) 263-2349**

**CERTIFICATE OF INTERESTED PERSONS
AND CORPORATE DISCLOSURE STATEMENT**

**Fabio Ochoa v. United States
Case No. 11-15620-F**

Appellant, Fabio Ochoa, files this Certificate of Interested Persons and Corporate Disclosure Statement, listing the parties and entities interested in this appeal, as required by 11th Cir. R. 26.1.

Aldazabal, Mauricio

American Civil Liberties Union of Florida, Inc.

Bergendahl, John

Bergonzoli, Nicholas

Black, Roy

Blue, John

Cardena, Carlos

Castiblanco, Jaime

Del Toro, Ricardo

Docobo, Richard

Dominguez, Humberto

Ferrer, Wifredo

Forman, Daniel

*Ochoa v. United States*
Case No. 11-15620

Garber, Hon. Barry

Gonzalez, Manuel

Klugh, Richard C.

Lewis, Neal R.

Marshall, Randall C.

Matters, Michael

McLaughlin, James A.

Moore, Hon. K. Michael Moore

Ochoa, Freddy Ivan

Perdomo, Sergio

Perez, Joaquin

Perczek, Jackie

Petruzzi, Paul

Ramsey, Rachael

Ryan, Edward

Scher, Todd

Schultz, Anne

*Ochoa v. United States*
Case No. 11-15620

Smachetti, Emily M.

Srebnick, Howard

Strafer, Richard

Sutton, Stacey

Toro, Maurucio

Santiago Velez

Walbolt, Esq., Sylvia

Walsh, Michelle

Monica S. Wetzel

UNITED STATES COURT OF APPEALS
ELEVENTH CIRCUIT

No. 11-15620-F

FABIO OCHOA,

       Movant/Appellant,

vs.

UNITED STATES OF AMERICA,

       Respondent/Appellee.

_____/

## APPELLANT'S MOTION FOR CERTIFICATE OF APPEALABILITY

Appellant, Fabio Ochoa, through undersigned counsel, respectfully moves, pursuant to 28 U.S.C. § 2253(c) and Fed. R. App. P. 22(b), for a certificate of appealability from the denial of his 28 U.S.C. § 2255 motion and requests a certificate of appealability for the following issues:

I.      Whether the district court erred in summarily denying, without an evidentiary hearing, claims of: (a) governmental misconduct in the failure to disclose significant *Brady* and *Giglio* material concerning government trial witness Alejandro Bernal and in the manipulation of trial testimony by Bernal and presentation of false evidence to the trial and grand juries; (b) ineffective assistance of counsel, including as to counsel's failure to properly preserve and raise issues of insufficiency of evidence or improper admission of Fed. R. Crim. P. 404(b) evidence, where the district court erroneously concluded, in the absence of any

submission of affidavits or other competing evidence by the government, that such actions were justified based on strategic decisions; and (c) the existence of a conflict of interest by movant's initial trial counsel that prevented negotiation of a plea agreement for the movant and aided the government in withholding material evidence.

II.   Whether the district court erred in failing to afford the parties reasonable notice of cancellation of the referral of the case to the magistrate judge, prior to summarily denying all claims.

III.  Whether in denying the movant's claims summarily and in denying movant's Fed. R. Civ. P. 59(e) motion, the district court procedurally erred in failing to conduct *de novo* review of the movant's requests for discovery, for preservation of testimony, for supplementation of the record, and for supplementation of the amended § 2255 motion, thereby misapplying 28 U.S.C. § 636 limitations as to reliance on magistrate judge rulings and violating the movant's right to independent consideration of his claims by an Article III judge.

IV.   Whether the district court's failure to afford *de novo* review of the movant's supplemental claims and requests for record supplementation, preservation of testimony, and discovery, as well as failure to address all ineffective assistance of counsel and conflict of interest claims and claim components stated in the amended § 2255 motion, including the movant's actual innocence claim and issues pertaining to the government's withholding, even during § 2255 proceedings, information reflecting Bernal's assertions about terrorism, constitute a violation of *Clisby v. Jones*, 960 F.2d 925, 936 (11th Cir. 1992) (requiring that the

2

district court resolve all claims on habeas review).

V.   Whether the district court erroneously rejected or failed to weigh sworn
     and unsworn exculpatory statements of Bernal made both prior to and
     after trial (that were not disclosed to the defense until years later) and in
     determining that the statements were merely unsworn recantations and
     that Bernal had recanted his recantations.

VI.  Whether the district court erred in denying motions for discovery,
     supplementation of the record, supplementation of claims, and an
     evidentiary hearing as to the government's failure to disclose significant
     *Brady* material concerning Bernal and governmental misconduct in the
     manipulation of trial testimony by Bernal and presentation of false
     evidence to the trial and grand juries, where there was a sufficient record
     basis to warrant such procedural relief and where claims relating to the
     failure to disclose *Brady* material were both timely and related back to
     the initial and amended § 2255 motion.

## GROUNDS FOR RELIEF

A.   <u>Introduction</u>.  Fabio Ochoa was extradited from Colombia to face
charges arising out of an investigation of cocaine trafficking organization run by
Alejandro Bernal (the "Juvenal" organization) in Bogota from 1997 to 2000.  Ochoa
was tried in the Southern District of Florida and was convicted of conspiracy to
import cocaine (21 U.S.C. § 963) and conspiracy to possess cocaine with intent to
distribute (21 U.S.C. § 846).  Bernal, the head of the targeted drug organization,

3

testified as a government witness at trial. The government has acknowledged that Bernal "was a very important witness in this case, and he had the most testimony to give about Ochoa's participation in this conspiracy." DE:72:28.

In October 2007, Ochoa filed his motion to vacate conviction under 28 U.S.C. § 2255, including in the motion arguments based on the failure of the government to disclose perjury by, and benefits promised to, Bernal in relation to his trial testimony. The § 2255 motion also alleged deficient performance of trial and appellate counsel, including a conflict of interest by the initial counsel, and claims relating to the government's intentional presentation of false evidence to the grand jury. Most notable in the motion was newly discovered evidence of substantial *Brady* and *Giglio* violations by the government, including the government's presentation of perjured trial testimony, where Bernal – without any contact, solicitation, or involvement by the defendant – was discovered to have written to the government, expressing in detail that the deal promised to him was violated despite his cooperation with the efforts of agents and prosecutors, beginning in Colombia and continuing throughout trial in the United States, to present false evidence, mischaracterize evidence so as to create a false impression of conspiratorial intent, and follow a false government script to prosecute Ochoa for offenses affording U.S. jurisdiction.

Beginning shortly after trial and continuing after the filing of Ochoa's motion

4

for relief under 28 U.S.C. § 2255, Bernal, in correspondence between himself and both the government and his counsel, revealed the circumstances surrounding his becoming a witness against Ochoa and the manner in which the government had utilized his testimony.  Bernal later made sworn statements – that Ochoa filed in support of the § 2255 and his efforts to amend his claims to include the newly-disclosed information – reaffirming what he had said in the correspondence.  Bernal explained a series of undisclosed promises made to him by the government concerning assistance with his financial and familial interests in Colombia and assuring that he would be able to relocate with his family in the United States, due to the significance to the government of the Ochoa prosecution and of Bernal's testimony.  Bernal related the lengths that he had gone to in order to serve as an effective government witness against Ochoa, particularly in establishing, through specific coaching as to matters of which he had no actual knowledge, that the conspiracy involved trafficking in the United States.  Like a quiz show contestant given the answers in advance, Bernal was prepared to testify to an intended effect in the United States where there was none.  Attached as Appendix A is a retyped content of the initial Bernal letter showing manipulation of testimony and perjury.

Despite contesting the veracity of these allegations by labeling Bernal's assertions as "baseless allegations of a disgruntled cooperating witness" (DE:11:6),

5

"blatant and recent fabrications" (DE:11:7), a 'thinly veiled extortion letter" (*id*.), a "series of false allegations" (DE:11:8), "inflammatory" (DE:11:9), "patently false" (DE:11:11), and "irrational and absurd" (DE:11:12), just to name a few, the government fought at every turn against conducting an evidentiary hearing to test not only the credibility of Bernal and his allegations but also the government's credibility when claiming it had no knowledge of the same.  Perhaps the most astounding of the government's claims was that, in its view, "Bernal is ***actually delusional***" and in need of a mental health expert.  DE:11:12 (emphasis added).  These are startling statements for the government to make about its own star witness against Ochoa.

In the months after the filing of Ochoa's § 2255 motion, the government began to provide additional correspondence from Bernal, and DEA reports of pretrial interviews with Bernal, revealing significant information about the government's management of Bernal as a witness, including that Bernal's motivation for testifying as a witness against Ochoa was based in part on his delusional belief that Ochoa was responsible for the attack on the United States by al Qaeda on September 11, 2001. Bernal, in his initial interviews with the DEA in Colombia recited his witnessing of events in a Colombian jail that showed Ochoa to have organized and been responsible for the 9/11 attacks.  Bernal's extensive claims about 9/11, as documented in the DEA reports, were never disclosed to Ochoa's trial counsel and were not fully revealed to

Ochoa's § 2255 counsel until more than a year after the filing of the § 2255 motion. Prior to trial, agents advised Bernal not to discuss the 9/11 issues due to purported national security concerns.  Bernal continued to tell his lawyers about his 9/11 evidence, but the information was kept from Ochoa's defense team.

Despite a compelling record basis for an evidentiary hearing on the Bernal issues, the allegations of ineffective assistance of counsel, and the presentation of false testimony to the grand jury, the district court denied the § 2255 motion without a hearing, after *sua sponte* vacating the referral of the case to a magistrate judge.

B.    Procedural overview.[1]  Ochoa appeals from the district court's denial of the § 2255 motion and denial of an evidentiary hearing.  Following the resolution of his direct appeal, Ochoa's § 2255 motion was timely filed on October 9, 2007.  DE:1. On October 11, 2007, the district court referred the matter to Magistrate Judge Barry Garber "for a ruling on all pre-trial, non-dispositive matters, and for a Report and Recommendation on any dispositive matters."  DE:3.  On February 13, 2008, Ochoa timely filed his amended motion to vacate pursuant to 28 U.S.C. § 2255.  DE:10.

Movant raised several discrete issues and sub-issues via his § 2255 motion. Movant also raised discovery, evidentiary, and due process issues during the many

---

[1]  This Court's decision in *United States v. Ochoa*, 428 F.3d 1015, 1022 (11th Cir. 2005), provides a factual background of the investigation of Bernal's activities by Colombian and U.S. authorities, including the wiretapping of Bernal's office.

7

months that movant's motion remained pending.  In support of his amended motion,

movant filed a significant number of exhibits including, but not limited to, sworn

affidavits, private correspondence between the government and the attorney for

Bernal, private correspondence between Bernal and his attorney, and other documents

corroborating and supporting movant's arguments.  The district court's order denying

the amended motion and the prior orders concerning the supplement to the motion,

motions for leave to conduct discovery, or for preservation of testimony fail to fully

incorporate or adequately address the evidentiary documents and filings.

Ochoa's amended § 2255 motion set forth seven primary claims with various

distinct sub-issues.  Claim 1 of the amended motion alleged a violation of the Fifth

Amendment as a result of the government's intentional use of false testimony at trial

and intentional suppression of material exculpatory evidence.  DE:10.  Specifically,

as to Claim 1, the motion set forth various *Brady* and *Giglio* violations as a result of

the government's failure to disclose benefits promised to its primary cooperating

witness, Alejandro Bernal, as well as perjury, the subornation of perjury, and the

government's failure to disclose strictly impeachment materials.  In connection with

these legal claims, and following the government's answer, Ochoa's counsel obtained

and filed numerous exhibits including the sworn affidavit of, and various documents

created by or in the possession of, Bernal including emails written by his lawyer and

8

prosecutors, a facsimile between the DEA case agent and Bernal's lawyer, an internal memo written by Bernal's lawyer, and letters from Bernal to his legal team.[2]

Among other things, the sworn affidavit, and other exhibits are evidence that (1) exculpatory and impeachment information was withheld from Ochoa's defense team during the trial before the district court, and (2) that the witness committed perjury during the trial.   DE:89, 90, 92, 94, 107, 131, 132, 141, and 142.   In particular, Ochoa filed, under seal, a sworn affidavit authored by Bernal *after* he was released from custody and his deportation deferred.   DE:132.   This affidavit clearly supports the claims set forth in the § 2255 motion.   DE:132.   The affidavit, sworn and subject to the penalty of perjury, details exculpatory and impeachment information withheld from movant's trial counsel, and shows perjury and subordination thereof as well as support for other issues raised by the movant.   DE:132.

On May 19, 2008, the magistrate judge conducted a status conference on the amended motion to vacate.   DE:33.   During the hearing, counsel for both the movant

---

[2]  These documents were either (1) provided to movant by the government after the filing of the government's answer, (2) obtained from the district court file after the documents were unsealed, (3) obtained from the government's witness after he produced them (which was after the filing of the government's answer), or (4) obtained from the government's witness following his release from custody.  It was through no fault of the movant that these materials were not obtained prior to the government's answer.  Indeed, in every instance, these documents were simply not available as they were in the sole custody and control of the government, the witness, or his counsel, or because the documents were not yet created or unsealed.

and the government explained that, not only was the government was still turning over relevant material to movant's counsel and that similar disclosures were anticipated to continue, but additional relevant materials remained under seal with the district court. DE:39:5-10. The parties then briefly addressed the claims in the amended motion and discussed whether an evidentiary hearing would be appropriate. *Id.* at 7-26. At the conclusion of the hearing, the magistrate judge stated that he would take the issue of an evidentiary hearing under advisement and directed the parties to confer in order to unseal additional documents that could support the movant's arguments. *Id.* at 26.

On May 28 and June 16, 2008, the movant filed, in support of, *inter alia*, the *Brady* and *Giglio* aspects of Claim 1 of his amended motion, several exhibits unsealed by the district court and provided to movant's counsel *following* the status conference. DE:34, 40. These documents included sworn declarations under penalty of perjury, e-mails, and other correspondence that further supported movant's claims or that corroborated the claims already made by the movant in his amended motion. DE:34, 40. The movant then filed a motion for leave to file a response to the government's surreply on the basis of the evidentiary materials unsealed, provided to counsel, and filed with the district court. DE:44. The movant explained that these newly disclosed materials undermined the government's arguments. DE:44. The

10

district court granted the movant's motion, DE:45, and the movant filed a response to the government's surreply, DE:48, that, *inter alia*, specifically incorporated the newly-disclosed evidence – including sworn statements and governmental admissions – into Claims 1 and 2 of the movant's amended motion. DE:48. The Government then filed a reply to movant's surresponse, DE:50, and the movant filed an additional exhibit, DE:52, that consisted of private correspondence between Alejandro Bernal and his attorney.

As a result of the late disclosures of *Brady* and *Giglio* material to the movant by the government and the unsealing of additional relevant *Brady* and *Giglio* materials by the district court following the status conference, the movant filed a motion for leave to conduct discovery. DE:54. Appended to the movant's motion were eight exhibits supporting good cause to conduct discovery. DE:54. The exhibits, which were also filed with the district court in support of the amended motion, included e-mails, letters, a facsimile, and an internal attorney memorandum that not only corroborated the factual and legal issues set forth in movant's filings, but that even predated the movant's trial. DE:54. The documents evidenced *Brady* and *Giglio* violations, perjury, and the subornation of perjury. DE:54. A hearing was held on the matter on February 6, 2009, the government disclosed, via filing, a DEA report, following the hearing, and, on February 23, 2009, the magistrate judge entered

11

an order denying the request for leave to conduct discovery. DE:64. Thereafter, the movant filed a sworn affidavit of Alejandro Bernal, DE:66, in support of movant's amended motion as well as a motion for reconsideration of the magistrate judge's order. DE:67. The motion for reconsideration was denied. DE:78.

On July 10, 2009, the movant filed a notice of intent to supplement his amended motion on the basis of any newly-disclosed evidence relating to his claims. DE:87. The movant then filed a sworn affidavit of Alejandro Bernal in support of his amended motion to vacate. DE:90,132. Neither the notice of intent nor the affidavit was addressed in any way by either the district court or the government. On the basis of the sworn affidavit of Bernal, and because Bernal was asking the district court for permission to leave the United States (despite being paroled into the United States by the Justice Department and being supervised by United States Probation), the movant filed a motion to preserve his testimony. DE:92. The magistrate judge did not address these motions, and on October 21, 2009, an amended motion to preserve and/or perpetuate testimony was filed. DE:107. Ultimately, the magistrate judge denied the motions, finding that they "have been previously considered by the district court when it denied the petitioner's right to pursue discovery." DE:114. This order, insofar as it would allow a material witness to leave the jurisdiction, was appealed to the district court. DE:117. Ultimately, the district court denied the movant's request

12

to preserve testimony and granted Bernal permission to leave the jurisdiction. DE:134.

In litigating his § 2255 motion, Ochoa sought to supplement his claims with affidavits and supporting information regarding the government's knowledge of Bernal's delusional claims about 9/11, Bernal's admissions that he had lied at trial to help the government, and the failure to disclose promises made to Bernal for his testimony. Ochoa first filed a supplement to Claims 1 and 2 of his amended motion. DE:99. The magistrate judge entered an order striking the supplement, DE:102; the movant filed a motion for reconsideration, DE:105, which was also denied by the magistrate judge. DE:113. This order was appealed by the movant to the district court. DE:116. The district court ultimately denied the appeal. DE:133. The movant then requested leave to expand the record pursuant to Rule 7, DE:135, a request granted, in part, by the magistrate judge. DE:139. Accordingly, the movant filed various sworn declarations of Alejandro Bernal, DE:141, as well as various unsworn declarations. DE:142. After several months, the district court *sua sponte* withdrew its reference of this matter to the magistrate judge, DE:144, and, directly thereafter entered a 12-page order denying Ochoa's amended motion. DE:145. The order failed to specifically address several issues pled by the movant, as well as nearly all of the movant's supporting exhibits.

13

C.    <u>The district court's erroneous summary denial of relief</u>.  The district court's final order prejudged factual disputes regarding Bernal's sworn and unsworn declarations regarding how the government caused him to invent testimony that would help prove U.S. jurisdiction over Bernal's drug shipments to Mexico as well as to falsely bolster the reliability and admissibility of the tape recorded conversations in Bernal's office in Bogota.  The district court failed to consider many of Bernal's statements, including all of the sworn statements by Bernal filed in this case.  Instead, the district court deemed review of the Bernal matter resolved by Bernal's statement of regret to the prosecutor that his admissions of perjury had gotten into the hands of Ochoa's post-conviction counsel.  CrDE:145:3.

Although the government has discounted the importance of Bernal to the government's case, relying on testimony of other witnesses from which an inference of Ochoa's knowledge of or support for Bernal's actions could be made, any such witnesses were substantially impeached at trial, including by conceding perjury and severe credibility issues; moreover, none of these other witnesses linked Ochoa to a conspiracy to violate U.S. drug laws or knowledge of an importation of drugs to the United States as contemplated by the indictment.

The district court failed to take into consideration that, apart from Bernal, these other cooperating government witnesses – who did not offer testimony regarding U.S.

14

jurisdiction, but testified that Ochoa had at least some awareness of Bernal's drug activities – were all heavily impeached.  Government witness Hector Londono admitted on cross-examination that he had previously committed perjury in another trial and that he had deceived the prosecutors in this case as well as other prosecutors by failing to admit his prior perjury.  CrDE:1577:48-52 (admitting also that he used bribery previously to avoid prosecution); CrDE:1578:16-17 (admitting to lying in another prosecution in order to avoid "going to jail").  He also admitted lying in his direct examination testimony regarding a claim of traveling with Ochoa to a supposed meeting with Bernal to discuss drug routes.  CrDE:1578:7-16, 45-46 (evidence showing that Londono traveled with another person, not Ochoa).

Similarly, government witness Santiago Velez admitted hiding from prosecutors the fact that he had previously lied while testifying as a cooperating witness, and video evidence established that Velez had lied in claiming that Ochoa participated in a conspiratorial meeting with drug trafficker Alberto Gallego. CrDE:1578:98-116.  Velez otherwise admitted having no knowledge about Ochoa's participation in any successful drug transactions by Bernal and denied knowing about any intent to importing into or possessing in the United States any drugs. CrDE:1578:127.  The remaining "co-conspirator" witness for the government, Freddy Ochoa, was also shown to have lied about Ochoa in material respects at trial,

15

including regarding his claim that Ochoa had contacted another drug trafficker to introduce him to Bernal. *See* CrDE:1575:13-21; CrDE:1576:20-26, 41-42, 46-54; CrDE:1578:88-91; CrDE:1579:4-5.

The district court's rejection of what it mischaracterized as a mere recantation as the premise for denying Ochoa an evidentiary hearing fails the statutory requirement for an evidentiary hearing where the record does not conclusively rebut the movant's allegations. *Sanz De La Rosa v. United States*, __ Fed.Appx. __, 2012 WL 1994742, at *2 n. 1 (11th Cir. June 5, 2012) (reversing denial of § 2255 relief where no evidentiary hearing was held, where government witness conceded both impeaching facts and erroneous testimony; "[W]e cannot say the questionable trustworthiness of the recantation is a proper ground for determining that the rest of the ***record affirmatively contradicts*** [movant's] allegations for the purposes of granting or denying an evidentiary hearing.") (emphasis added).[3]

---

[3]  The government's placement of particular weight on Bernal as a witness is seen in the description of the case in press releases as the "Juvenal Organization," *see* http://www.justice.gov/dea/pubs/pressrel/pr090701.html, at page 2, with Bernal identified as Juvenal. Bernal was central to the thesis of an conspiracy that had as its goal the violation of U.S. drug laws.  The government's *post hoc* attempt to minimize Bernal's central importance in proving the indicted drug conspiracy does not coincide with the record or the case law.  The Supreme Court's recent decision in *Smith v. Cain*, 132 S.Ct. 627, 630 (2012), reveals that suppression of contradictory statements by a key government witness is a quintessential *Brady* violation warranting relief. *Id*. (materiality of Brady violation where court left to "speculate about which of [witness's] contradictory declarations the jury would have believed").

16

The district court's final order denying relief is premised on findings and conclusions that are unsupported by the record and contrary to this Court's precedents, reflecting a misconstruction of both the pleadings and record as well as adoption of the government's partisan prejudgment of facially meritorious, uncontradicted claims.  Review of the district court's order reveals:

- The order ignores the liberal standard for the grant of a § 2255 evidentiary hearing, cites none of movant's affidavits or record submissions, and rests instead on the district court's personal judgments as to witness Bernal and other matters that the movant had no opportunity to address since he believed the case was pending before a magistrate who would afford the matters an independent review.

- The order ignores that the government, throughout four years of litigation in this case, has offered ***not a single competing, much less contradicting, affidavit*** by any agent or prosecutor or by any witness at all.  All of the declarations presented in respect to this litigation are declarations in ***favor*** of relief.

- The order refers to Bernal as "one of four co-conspirators who testified as to Ochoa's involvement," DE:145:2, but the record shows, and the government conceded, Bernal was the most essential witness linking Ochoa to any of the activity within the parameters of the indictment.  And unlike other cooperators who testified to matters other than U.S. jurisdiction and were heavily impeached, he was not a proven liar at

17

the time of trial, rendering crucial the *Brady* and *Giglio* violations.

- The order states, in plain contradiction of the record: "On September 20, 2007, Bernal ***appeared to admit*** the contents of the first letter were fabricated, stating 'I have acted erroneously, under much pressure, financial and family problems and with Olivia.'" DE:145:3 (emphasis added). The district court offers no basis at all for its claim of fabrication of false evidence or that Bernal was retracting even a single word of his sworn statement, as opposed to expressing fear that his admission of the truth would cause him problems with the government. Bernal never retracted anything he said about the government's improprieties. He expressly made clear that attorney Ruben Oliva asked him to retract in order to please the government, but that Bernal refused. The order ignores that Bernal himself addressed the government's distortion of his note to the prosecutor regarding such matters as family pressure: "In the note that I wrote to you after sending you the May 28, 2007 letter, in which you say that I·take back from what I had said in the letter, ***that is not true***, I do not take back what I said. What I did was apologize to you for having caused problems that could have been avoided ... . Oliva did ask me to write a letter in which I took back what I had written in it, but I said I wouldn't, that I was saying the whole truth in it, that how dare he ask me to do that. That's why I fired him, and discharged as my attorney; it was because he was encouraging me to lie again." DE:40-1:54-55 (emphasis added);

18

*see also* DE:10-1:15 (discussing the firing of Oliva due to having futilely urged for a retraction of the Bernal statements to suit the government's needs in this § 2255 proceeding). The government's failure to admit that Bernal ***never*** retracted his statements led to the order's erroneous claim of fabrication for which there is no evidentiary basis. Thus, the government's creation out of whole cloth of an argument leading to the order's finding that Bernal's statements constitute "a recanted recantation," and premised on that strawman version of the record to find that "[f]ew kinds of new evidence are less trustworthy," DE:145:5, than Bernal's flies in the face of a consistent, repeated and unwavering "recantation" – if it is such – as strong and repeatedly sworn to as in any reported case, in that for at least 8 years, Bernal has said the government knowingly presented perjured testimony.

- The order disputes what "significance attaches to whether Bernal saw the recorded wiretaps," DE:145:3, but ignores the abundant record evidence of the importance of having Bernal make that false claim at the time that he did, beginning with his interview by the ***Colombian*** police. Bernal swore that he was led to make this representation because of the needs of Colombian police to establish the legality of the taping and avoid suppression of the tapes from being turned over to the United States. Bernal had made this revelation to his attorney as early as August 28, 2003, shortly after being confronted by Agent Minh following trial with the fact that the

19

recording equipment had been removed by the time of Bernal's supposed entry into the adjacent office to see the recording equipment (i.e., Minh's admission that the government knew Bernal had lied about seeing the tape recording equipment). DE:52-1:2-3 (Bernal writes to his attorney, Ruben Oliva: "I don't understand, Ruben: in Colombia, before I was brought here, Col. Gonzalez asked me to say I had been there (inside the adjacent office) two months earlier. He explained this was a favor requested by DEA-Colombia and General Serrano, because in Colombia it is illegal to install microphones inside an office and this would show an alternate way that they could have listened to conversations going on in my offices."). Of course, there was an interest in having witnesses confirm the propriety of the Colombian taping. Further, at trial, Bernal's testimony regarding the taping helped to validate his interpretation of the recordings, overcome the weakness of the recording evidence in regard to Ochoa, and convince the jury of Bernal's claims of more incriminating conversation by Ochoa that was not taped.

● The order wrongly seeks support from an appeal in Bernal's own case, citing that decision as support for the district court's otherwise unsupported assertion – based presumably on a determination made in another proceeding to which the movant was not a party – that Bernal "brought a meritless *pro se* claim to compel the Government to fulfill the alleged promises." DE:145:5 (citing *United States v.*

20

*Bernal-Madrigal*, 346 Fed.Appx. 397 (11th Cir. 2009)).   Contrary to the district court's suggestion, however, this Court **did not opine on the factual validity of Bernal's claims** or pre- and post-plea promises by the government.   Indeed, this Court properly presumed the truth of Bernal's assertions.

●     The order unreasonably asserts that "the recantation itself is **incredible**" and "the recantation letters are **worthless** as new evidence."   DE:145:5, 6 (emphasis added).   The district court bases this assertion on its misreading of the claims and the sworn statements – *see* DE:40-1 (sworn verification by Bernal under penalties of perjury, in compliance with 28 U.S.C. § 1746); DE:66 (valid sworn statement of Bernal under 28 U.S.C. § 1746); DE:90 (notarized affidavit of Bernal) – of the government witness, such that the district court mistakenly claims Bernal's affidavit "contains allegations that a prosecutor earnestly invited Bernal to live with him after the trial was over.   Similarly, the suggestion that the government would undergo an intense lobbying effort to knowingly make Bernal perjure himself by stating he saw the hidden wiretaps is nonsensical."   *Id*. at 5.   The assertions by the district court as to a claim by Bernal that a prosecutor wanted to live with Bernal are totally foreign to the record.   *See* DE:10-1:17 ("Tell Ed Ryan that when he invited me **to live in North Carolina after the trial**, I thought he was serious since he was very grateful to me.")   It was a caricature of the record to claim a suggestion to live in North

21

Carolina is an invitation to move in with the prosecutor.

●     The order wrongly devalues the import of the *Brady* and *Giglio* material at issue in Claim 1. *See* DE:145:6. Bernal's need for immigration benefits supposedly flowed from the legitimate concerns of the government that went well beyond length of incarceration. Further, the benefit of non-prosecution of a family member has been held to be of sufficiently distinct value as an inducement to compel disclosure. And as the district court explained in *United States v. Williams*, 954 F.2d 668 (11th Cir. 1992), exclusion of the powerful nature of the impeachment is grounds for reversal. *Id.* at 972 ("jury has the right to know what may be motivating a witness"; concluding that powerful motivations for assisting the government, such as a ***large*** payment to an informant, are "just the kind that are of the most help to the jury in arriving at the truth").

●     The order reasons that "in light of overwhelming uncontested evidence that the wiretap recordings were authentic, even if Bernal lied while testifying about seeing the wiretaps, no juror could reasonably find based on this evidence that Ochoa was innocent." DE:145:6. In analyzing the import of the tapes, failed to employ the *Alzate* standard applicable to *Giglio* violations. In *United States v. Alzate*, 47 F. 3d 1103 (11th Cir. 1995), this Court, in stating the rule applicable to legal arguments as well as factual testimony, held that "explicit factual representations by the prosecutor as

22

side bar and implicit factual representations to the jury during cross examination,"
when knowingly false, were subject to the same standards used to review a
prosecutor's knowing use of perjured testimony. *Alzate*, 47 F. 3d at 1110.  Since both
types of prosecutorial misconduct involve "a corruption of the truth-seeking function
. . . albeit through different means," the district court held that reversal would be
required "if there is ***any*** reasonable likelihood" that the misrepresented facts "***could
have*** affected the judgment of the jury."  *Id.* at 1110 (quoting *United States v. Agurs*,
427 U.S. 97, 103 (1976)) (emphasis in original).  Here, revelation of the lie about
discovering the taping would have severely damaged all of Bernal's testimony about
the recordings, including his attribution of statements to Ochoa.

●      The order states that "Bernal himself still maintains that Ochoa was guilty of
narcotics trafficking," DE:145:6, but fails to incorporate that fact into the reliability
of Bernal's affidavit as relevant to the claims in this case.  The trial of this case was
not about whether the defendant ever engaged in drug trafficking, but whether he
violated United States law as alleged in the indictment and in accordance with the
terms of the extradition treaty.  If the government were merely seeking to prove
academic facts, then Bernal's continued belief that Ochoa was involved in drug
trafficking would be helpful to the government, but given the allegations of a
conspiracy to import drugs into the U.S. and given Bernal's ***direct refutation of that***

23

*claim* and his specific allegations of being coached to say the contrary of what he knew to be true, one cannot fairly pick and choose those aspects of Bernal's testimony that help the government in order to deprive the movant of an evidentiary hearing to which he is entitled. Bernal's importance as a government witness on the jurisdictional issue was reluctantly acknowledged even by movant's trial counsel in moving for a judgment of acquittal under Fed. R. Crim. P. 29 at trial. *See* CrDE:1580:60-61. Thus, it is no new perspective that leads to the conclusion that Bernal's admission that he was coached to lie about jurisdiction shows a fundamental *Giglio* violation.

•    Conceding "several correspondences from the Government suggesting that they were assisting Bernal and his family in ways that went ***beyond*** the language of the plea agreement," DE:145:6 n.5 (emphasis added), the order asserts that the government's actions in seeming consistency with the very claims made by Bernal as to pretrial promises are of ***no*** evidentiary value because "the Government had legitimate reasons to protect the safety and well-being of Bernal and his family, including fulfilling nonlegal ethical duties and encouraging future potential cooperators to come forward." However, the ***legitimacy*** of the government's reasons for offering such benefits to the witness is not and has never been the issue, but rather it is the ***failure to disclose and allowing the witness to lie*** on the witness stand about

24

it that presents the need for an evidentiary proceeding.

• The order asserts that "Ochoa has made no showing that the outcome would have been different had the record been developed further" as to the failure of proof of intent to violate United States drug laws as opposed to those of Mexico or Colombia. DE:145:7 n. 6. But as he alleged in his motion that the government overreached in asserting United States jurisdiction by diverting to Texas a vessel headed to Vera Cruz, Mexico, *see* DE:10:47, and falsely arguing to the jury that the vessel, The Astor, had sailed from a Colombian port in Cartagena; that the supposed involvement of the movant in the Sony route to New York both preceded the scope of the extraditable offenses and was abandoned by the government in closing argument at trial due to insufficient proof; and that the remaining claim of payment in dollars and potential sales by Mexican traffickers in the U.S. was too tenuous, even if there had been any evidence of the movant's knowledge of such, to place him within the terms of a conspiracy to violate U.S. laws.

• The order ignores that movant's appellate counsel pursued trial errors claims – venue (that could have incorporated jurisdiction, but failed to); exclusion of evidence, and constructive amendment – that this Court deemed so utterly meritless as to warrant no discussion at all. *Ochoa-Vasquez*, 428 F.3d at 1047. The Order likewise sees no apparent merit in any of the trial issues raised on appeal and does not

25

even reference them, as they were so lacking in substance and so much weaker than the sufficiency claim. The order notes that counsel intervened in another appeal regarding a moot point as to court disclosure of records, that the ACLU of Florida filed an amicus brief on that academic endeavor "in the primary appeal," and that counsel, after the pursuing the direct appeal, "later brought a second appeal based on newly discovered evidence." DE:145:9. But these appellate diversions in no way diminish the need to weigh the merits of potential arguments. Indeed, reason compels that it is a fundamental obligation of counsel to preserve and raise arguable claims of insufficiency of the evidence and that it is the sine qua non of ineffective representation to fail to raise a valid claim of the invalidity of the conviction due to insufficiency of the evidence. Insufficiency of the evidence is the primary issue; it is not just another academic question to be considered. Particularly here, where modification of the venue argument could have easily accommodated the jurisdictional argument, failure to raise it lacked any strategic justification.

● The order notes: "Bernal testified that a co-conspirator ... transported a 8,671 kilo load of cocaine to the United States . ... He testified further that Ochoa had invested in this share in this load." DE:145:10. This finding shows nothing more than the crucial importance of Bernal's lies about U.S. trafficking. The truth was that Bernal was not sharing in any profit from any subsequent conduct by Mexican

dealers. He was not invested in subsequent handling of the drugs and stood in the

position of a seller to Mexican purchasers' market-price buyer status. Thus, to take

a hypothecated guarantor status for Ochoa and convert it into having a stake in

subsequent *potential*, *unproven* actions by Mexican traffickers rendered evidence

offered by the government wholly insufficient, no stronger than that found inadequate

in *United States v. Arbane*, 446 F.3d 1223 (11th Cir. 2006). *See id*. at 1227

(recognizing that past involvement in drug activity does not qualify as evidence of an

agreement to import narcotics)(citing *United States v. Fernandez*, 797 F.2d 943, 949

(11th Cir. 1986)).

●     The order recognizes, but fails to fully address the component of the motion

dealing with Bernal's false testimony seeking to establish U.S. jurisdiction and a U.S.

destination for the cocaine. DE:145:10 n. 7. While the district court recognizes the

supplementation of the record on this ground – as first articulated in the amended §

2255 motion, DE:10:20 ("Bernal's December [2007] letter further details the extent

of the lies to which he was forced to testify at Movant's trial, including on the critical

issue of the destination of the drugs purportedly destined for the United States.") –

the district court plainly errs in denying relief and denying an evidentiary hearing

solely on grounds of credibility that *require* the conducting of an evidentiary hearing.

*See* DE:145:10 n. 7 ("To the extent Ochoa's arguments are based on Bernal's

27

recantation of this testimony, his claim is denied for the credibility reasons stated in

Section II.").

      As important as all of these fundamental errors are to showing the error in the

denial of an evidentiary hearing in this case as to Claims 1, 2, and 3, of equal

importance is the order's contravention of the rule of law announced in *Clisby v.

Jones*, 960 F.2d 925 (11th Cir. 1992) (*en banc*) (requiring that habeas courts address

all claims; habeas disposition that allows for piecemeal litigation of federal habeas

petition must be reversed), in failing to even address the overwhelming evidence

pertaining to *Brady* violations concerning Bernal's inflammatory and plainly

damaging (to the government) claims attributing to the movant responsibility for the

terrorism events of September 11, 2001 in this country.  The incredibly tall tales

repeatedly told to the government by Bernal as to 9/11 constitute *Brady* material so

fundamental that even when hints of reference to terrorism emerged in a December

2007 letter written by Bernal and attached to the amended motion, DE:10, the

government still did not then provide to the movant the DEA report of Bernal's 9/11

fantasy.  *See* DE:11 & 11-1 at 43 (government filing acknowledges notice of

ambiguous reference to terrorism, but does not correct vague reference).  Amazingly,

not until ***after*** the Magistrate Judge had preliminarily prejudged the claims in this

case at the May 19, 2008 hearing did the government admit that Bernal had in fact

made some form of claims regarding the movant's responsibility for 9/11.  The movant's persistent efforts since that highly belated disclosure in this case to unearth the truth about Bernal's delusional – at best – attribution of the 9/11 attacks to the movant and attempts to bring the issue fully into play as part of Claim 1 and as an evidentiary factor to be used in evaluating the remaining claims of government impropriety in this case warranted discussion in the order, but were completely ignored.

The record is replete with litigation of the 9/11 issues as part of the case.  The government could not possibly have dared independently to challenge their absence from the first  amended motion given that the government failed, until after the Magistrate Judge had formulated his initial conclusions, to even begin to admit that reports verified Bernal's outrageous comments, claims, beliefs, fears, and motivations.  The record shows: DE:34 (movant "expressly incorporates" the government's late-disclosed 9/11 "documents into his Amended § 2255 petition"); DE:54 (movant's motion, on 11/25/08, for discovery as to the complete record of 9/11 claims made by Bernal); DE:56:5 (movant's motion, on 1/27/09, for evidence of Bernal's "falsely implicating Petitioner in the September 11, 2001 attacks on the United States," explaining that these "lies would have impacted Petitioner's trial and may likely have altered its outcome were they all submitted to the jury" and that

29

"[n]ot only would jurisdictional issues exist that could have acted to bar ... prosecution in the first place, but Bernal would have been exposed as a liar who would go so far as to attempt to frame the Petitioner for being involved in the most egregious and infamous terrorist attacks" in U.S. history); DE:60:1 (government acknowledgment of the 9/11 issues as a new potential claim by the movant; noting movant's reliance on the 9/11 Bernal letters as a substantive basis for relief well within one year of the government's disclosure of the pertinent DEA report on the matter – a report that should have been turned over by the government immediately upon filing of the § 2255 motion, not to mention prior to the underlying trial); *id*. at 5-6 (government addresses 9/11 claims on the merits, claiming feebly that such insanity could not "have affected Bernal's credibility" in the eyes of the jury); DE:63:1 (government argues 9/11 issues on the merits, not claiming waiver, and acknowledges that the 9/11 claims were argued on the merits at the 2/6/09 hearing before the Magistrate Judge, DE:72); DE:64 (magistrate judge's order denying discovery treats the 9/11 claims on the merits as part of *Brady* arguments of Claim 1); *see also* DE:128 (explaining history of litigation of 9/11 issue in this case thwarted peremptorily by magistrate judge's claim that it was already resolved at some other time in the case). The order's failure to address this hot potato issue of *Brady* violations alone compels granting of this motion.

30

Seeking to address the issue despite denials of discovery, on September 25, 2009, movant filed a supplement to his previously-filed amended § 2255 motion (DE:99). In that supplement, movant alleged additional information that related to the allegations he previously made in Claims 1 and 2 of his amended § 2255 motion. Specifically, movant alleged that the government improperly failed to disclose significant documentary evidence that, prior to movant's trial, Alejandro Bernal had claimed to the government that movant was the mastermind behind the September 11, 2001, terrorist attacks on the World Trade Center in New York (DE:99:3). As the supplement made explicitly clear, the allegations set forth in the supplemental pleading were based on information that had not been available to the movant prior to the filing of his amended § 2255 motion, and included specific documentation from Alejandro Bernal that had been recently unsealed by district court order and/or disclosed by the government during the course of the litigation of movant's 2255 petition. For example, the supplement referred to various letters from Bernal to Assistant U.S. Attorney Del Toro (DE:99:3-6), and from Bernal to Assistant U.S. Attorney Glenn Alexander (DE:99:6-7). The Supplement further detailed letters from Bernal to his attorney, which had been unsealed by the magistrate judge on motion by the movant in this proceeding (DE:99:7-13). The supplement also referenced a DEA debriefing with Bernal from prior to movant's trial which the government never

31

disclosed (DE:99:13-14). The supplement also explicitly referenced the fact that the allegations contained therein were supported by a sworn affidavit from Alejandro Bernal, an affidavit which had then been filed in court under seal (DE:99 n.1). Bernal's affidavit has since been unsealed but has never been considered either by the magistrate judge or the district court in denying movant's 2255 motion without an evidentiary hearing.

Four days after movant filed his supplement, and without any position having been taken by the government, the magistrate judge issued an order *sua sponte* striking the supplement (DE:102). Despite acknowledging that the supplement "relates" to movant's amended motion, the magistrate judge struck the supplement because it was filed without leave of court, was not based on any federal rule, was an "attempt[] to relitigate the facts presented during the course of the trial" and "reasserts matters that have previously been considered by the district court, and makes no presentation of any facts or issues not previously raised and considered." DE:102. A timely motion for reconsideration was filed before the magistrate judge (DE:105), who, after receiving a response from the government (DE:109), denied reconsideration. DE:113. This time, the magistrate judge elaborated further on the basis of the striking of movant's supplement, and he concluded that "Been there-done that" described movant's attempt to have the district court reconsider its striking of

32

movant's supplement (DE:113:1). The magistrate judge also concluded, as justification for striking movant's supplement, that movant's convictions had been affirmed by this Court. DE:113:2.

The initial letter sent by Bernal to the government (May 28, 2007 – DE:1:5) admitted his perjury and pointed to the government as the initiator of that perjury. The letter was not a "recantation" letter under traditional legal terminology, because when Bernal made the statement, he did not know it would be revealed to the defense. He believed he was addressing only the very people with whom he had made a deal that included his giving shaded and false trial testimony. According to Black's Law Dictionary, to "recant" is to "withdraw or repudiate *formally* and *publicly*." Black's Law Dictionary, 5th Edition, p. 1139 (emphasis added); *see id.* (providing that recantation is a representation made for the purpose of correcting the record *so as to eliminate the effect of perjury*). Bernal's initial letter was not a recantation as the term is ordinarily understood in the case law, but was instead a communication to the government about receiving his reward for false testimony he gave in the successful prosecution of a *particularly desirable target* for the government.

Nor did the Bernal statements merely reveal perjury, but rather they outlined how the government had manipulated and controlled his testimony to get the desired effect. Bernal made specific assertions regarding the actions of government agents,

33

yet the government offered no statements or proffers by any of those agents – all of whom are still available – to correct or clarify any of Bernal's representations.

Not only was Bernal's initial letter not a mere recantation (and instead ostensibly part of a discussion with his government handlers), Bernal *has never retreated from any statement he made in his initial letter* and he later expanded on and offered corroborative facts as to the letter's assertions after the government exposed the letter to the public without prior notice to Bernal.[4] Bernal then submitted multiple letters and affidavits, and under governing Supreme Court precedent, the *entirety* of the new Bernal evidence – all of the affidavits, including the letters as to which Bernal later swore to their truth and incorporated by reference, *see* DE: 90, 132, 141 – must be considered and addressed, rather than, simply disregarding, as the government sought to do here, Bernal's communications and affidavits following his statement of regret that revelation of his statements had compromised the government's case against Ochoa. *See Hysler v. Florida*, 315 U.S. 411, 417-18, (1942) ("The Florida Supreme Court had before it four affidavits by Baker. The affidavits must be considered here as they were before that Court-in their *entirety*.")

---

[4] In at least one letter, attorney Ruben Oliva confirmed that his representation of Bernal included negotiations concerning benefits discussed in Bernal's initial letter. Moreover, in pretrial correspondence, Bernal confided in Oliva that the government had asked him to lie about issues pertaining to the placement of the recording device that purportedly picked up Ochoa's voice.

34

(emphasis added).

As Bernal's statements and affidavits indicated, he still harbored animus towards Ochoa and believed he could still inculpate Ochoa in the commission of an offense in Colombia or in non-drug offenses. Thus, treating Bernal's letters to the government as either a mere recantation or, without textual support, a recanted recantation that obviates the need for the consideration of the entirety of his statements and affidavits, contravenes governing procedural requirements for consideration of the evidence and selectively ignores the full force and meaning of the Bernal admissions.[5]

D.    <u>Denial of requests for discovery and an evidentiary hearing</u>. That he had made the grand 9/11 accusation early in the pretrial period and the government had suppressed it from the defense was not only independent evidence of government misconduct, but warranted consideration due to the importance of all of the letters in evaluating Bernal's trial credibility, animus against Ochoa, and potential mental

---

[5] The district court acknowledged that Bernal continued to try to incriminate Ochoa, DE:145:6, but failed to note that this enhances the credibility of Bernal's assertion of government misconduct. The focus of the § 2255 inquiry should have been why the government needed Bernal to testify to more than mere drug trafficking association with Ochoa and needed him to falsely link Ochoa to U.S. drug importations. It was his perjury in that area that made the government's case successful. That Bernal maintains his testimony, except for points the government asked him to alter, shows a basis for a finding of credibility, not the contrary as found by the district court. *See* DE:145.

35

health issues that the government claimed to be recent vintage – *see* DE:11 at 12 (government alleges, even prior to disclosure of 9/11 allegations that "Bernal is actually delusional"; arguing that the "delusional letters are a call for mental health treatment, not an evidentiary hearing").

The "mental health" issues addressed in the government's initial response to the amended § 2255 motion were de-emphasized by the government when it became apparent that Bernal's delusional beliefs about 9/11 evidence against Ochoa were known to and suppressed by the government long prior to trial and even after the filing of the amended § 2255 motion.   Even if the government's emphasis on delusions and mental health issues were to be deemed to detract from evidence of manipulation of Bernal to assert a conspiratorial intent to violate U.S. drug laws, the governing case law shows that the 9/11 evidence suppressed by the government is of great significance.   In the leading case on this issue, *Mesarosh v. United States*, 352 U.S. 1, 4, 77 S.Ct. 1, 3 (1956), the Supreme Court recognized that where a key witness's delusions relating to the subject matter of the case come to light, a hearing on the matter is the minimal relief that should be afforded.   *Id*. (noting the government's position: "While adhering to its position that 'the testimony given by Mazzei at the trial (in this case) was entirely truthful and credible,' the motion stated that 'these incidents, taken cumulatively, lead us to suggest that the issue of his

36

truthfulness at the trial of these petitioners should now be determined by the District Court after a hearing.'").

But in *Mesarosh*, the Court went beyond merely ordering a new evidentiary hearing, finding that where the witness's delusional accusations call into question his reliability as a witness at trial – even though the government maintains that the trial testimony itself was accurate – a new trial is required to prevent the effect of perjury on the jury's verdict from going unchecked. *See id.*, 352 U.S. at 8, 12, 77 S.Ct. at 5, 7 (at a minimum a hearing as to possible perjury was required where government conceded that witness's "bizarre testimony" in later proceedings "might have been caused by a psychiatric condition, and that such condition might have arisen subsequent to the time of this trial"; reversing convictions and remanding for new trial where perjury existed because "[o]nly the jury can determine what it would do on a different body of evidence, and the jury can no longer act in this case"); *id.*, 352 U.S. at 13-14, 77 S.Ct. at 8 (this result was required "even though the judge might believe that Mazzei's bizarre testimony in 1956 concerning plans for the assassination of other officials, the destruction of bridges, training in sabotage and handling arms, and the poisoning of water in reservoirs, all to destroy the Government of the United States, was the product of a mental or emotional condition that had developed only *after* the time of this trial") (emphasis added).  In the present case, evidence of the

37

Bernal delusions regarding Ochoa existed and was suppressed by the government in the ***pretrial*** period, with the government then seeking to take advantage in its initial § 2255 response by implying that Bernal was *now* delusional.

The *Mesarosh* grounds for an evidentiary hearing or greater relief are even stronger in Ochoa's case, with pretrial delusions animating Bernal's testimony, government suppression of that mental state while controlling the witness's testimony, and then when subsequent revelations of Bernal's reasons for testifying as he did arise, the government claims post-trial mental health issues. *Mesarosh* required an evidentiary hearing here. *See, e.g., United States v. Espinosa-Hernandez,* 918 F.2d 911, 913 (11th Cir. 1990) (newly-discovered evidence as to questionable conduct and misstatements by government witness, including suppression of evidence as to informant, detracted from integrity of proceedings, thus compelling discovery and evidentiary hearing "to 'remove the taint' from Espinosa's conviction")(citing, *inter alia*, *Mesarosh v. United States*, 352 U.S. 1, 77 S.Ct. 1 (1956)).

Restriction of discovery in this case did not comport with applicable legal standards. The magistrate judge's reliance on *Arthur v. Allen*, 459 F. 3d 1310 (11th Cir. 2006) [ *Arthur II*], was misplaced. DE:64. *Arthur II* does not bar discovery unless a habeas petitioner shows "good cause" to believe he may not be guilty, or that there is sufficient doubt about guilt to undermine confidence in the result of the trial.

38

DE:64.  *Arthur II* is a modification on rehearing from the original decision in *Arthur*

*v. Allen*, 452 F. 3d 1234 (11th Cir. 2006) [*Arthur I*].  A review of *Arthur I* reveals its

inapplicability to the present case; the *Arthur I* and *Arthur II* decisions lend no

support for the denial of discovery to movant.  Movant is not raising an actual

innocence claim as a gateway to overcome a state procedural bar or statute of

limitations.  Instead, the claims to which movant's request for limited discovery are

addressed raise allegations of prosecutorial misconduct pursuant to *Brady v.*

*Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972).  *See*

*generally United States v. Weintraub*, 871 F. 2d 1257, 1259 (5th Cir. 1989).

The absence of discovery and an evidentiary hearing as to the *Brady* issues

presents a substantial issue, as this Court recently observed in considering a

government request to prevent disclosure of witness misconduct.  *United States v.*

*Ignasiak*, 667 F.3d 1217, 1237 (11th Cir. 2012) (expressing "our serious concerns

about the government's reasons for keeping that notice" of witness misconduct and

bizarre behavior secret) (citing, *inter alia*, *United States v. Ochoa–Vasquez*, 428 F.3d

1015, 1029–30 (11th Cir.2005)).

The district court's failure to consider – on any basis at all – the newly-

discovered evidence of suppression of Bernal's delusionary claims of Ochoa's

involvement in the 9/11 terrorist attacks, assertions that undermined Bernal's

39

credibility, showed the government's ability to manage Bernal's testimony to avoid revelations that would damage its case, and called into question, under *Mesarosh* and *Espinosa-Hernandez*, the reliability of the government's case, unfairly impeded Ochoa's ability to litigate effectively his § 2255 claims.

Contrary to the order denying discovery to Ochoa, the standard for granting relief on *Brady* or *Giglio* grounds is not equivalent to the standard for granting discovery. To show "good cause" for leave to conduct discovery, a movant *need not show innocence or entitlement to relief on his habeas petition. See Moore v. Gibson*, 195 F. 3d 1152, 1164-65 (10th Cir. 1999) (given that trial record lends support and does not contravene petitioner's allegations which, if proved, would warrant habeas relief, district court abused its discretion in denying leave to conduct limited discovery); *Teague v. Scott*, 60 F. 3d 1167, 1172 (5th Cir. 1995) ("Denial of an opportunity for discovery is an abuse of discretion when the discovery is necessary to fully develop the facts of a claim"). Not only did the district court fail to apply the "good cause" standard for granting discovery, instead relying on a standard for establishing ultimate relief under *Brady*, it also misapplied the *Brady* standard in concluding that "it would be impossible for the petitioner to raise any doubts as to the results of his trial given the overwhelming evidence of guilt presented to the jury in the trial." DE:64. Critically, the district court's view that the asserted

40

"overwhelming" evidence at trial suffices to defeat a *Brady* claim is entirely incorrect.

As the Supreme Court has explained, in language written with unmistakable clarity,

the "rule is clear, and none of the *Brady* cases has ever suggested that sufficiency of

evidence (or insufficiency) is the touchstone." *Kyles v. Whitley*, 514 U.S. 419, 434

n.8 (1995). Just as the sufficiency of evidence does not satisfy the *Brady* test, neither

does the fact that evidence, even "substantial evidence," was used to impeach Bernal

at trial. DE:64. While Bernal was cross-examined at trial, this does not render the

withheld information cumulative. Bernal was, by anyone's definition, the

government's "star" witness at trial; his name and his testimony were invoked by the

government practically on every page of the government's closing argument.

　　　Whether a constitutional violation has occurred is, in part, measured by the

importance of the witness. This Court has repeatedly recognized that a defendant's

confrontation rights are at their zenith "[w]hen the witness the accused seeks to cross-

examine is the `star' government witness, providing an essential link in the

government's case." *United States v. Calle*, 822 F. 2d 1016, 1020 (11th Cir. 1987).

*Accord United States v. Lankford*, 955 F. 2d 1545, 1548 (11th Cir. 1987); *United

States v. Summers*, 589 F. 2d 450, 460 (5th Cir. 1979); *United States v. Barrentine*,

591 F. 2d 1069 (5th Cir. 1979). *See also Kittleson v. Dretke*, 426 F. 3d 306, 320 (5th

Cir. 2005). The suppressed information must be evaluated in light of the effect on the

41

government's case as a whole and the "importance and specificity" of the witness'

testimony. *United States v. Scheer*, 168 F.3d 445, 452-53 (11th Cir. 1999).

> In short, [the witness about whom impeachment evidence was withheld]
> was a crucial prosecution witness. Again, we do not imply that he was
> the only witness who testified against Scheer, nor do we suggest that
> there was not other compelling testimony that would support Scheer's
> conviction. ***Rather, it is because of the relative importance of Jacoby's
> testimony that we view his credibility to the jurors as so fundamental
> to Sheer's convictions.***

*Id*. at 456 (emphasis added). Given the substance of the withheld information and

false testimony, the impeachment revealed in Bernal's admissions of false testimony

"cannot automatically be categorized as cumulative." *Crisp v. Duckworth,* 743 F. 2d

580, 585 (7th Cir. 1984). Moreover, the information now known about Bernal

"would not have been merely repetitious, reinforcing a fact that the jury already

knew; instead, `the truth would have introduced a new source of potential bias.'"

*United States v. Rivera Pedin*, 861 F. 2d 1522, 1530 (11th Cir. 1988) (quotation

omitted).

In addition to the Bernal revelations, the § 2255 motion also presented

evidence of intentional introduction of false evidence to the grand jury that indicted

Ochoa and that counsel for Ochoa failed to adequately pursue remedies for such

violation. *See United States v. Mechanik*, 475 U.S. 66, 78 (1986) (dismissal of an

indictment is appropriate if it is established that a violation substantially influenced

42

the grand jury's decision to indict, or if there is "grave doubt" that the decision to indict was free from the substantial influence of such violations). While the district court determined that mere false evidence will not, in the post-trial context, invalidate an indictment, the law is clear that intentional presentation of false evidence to the grand jury must be treated differently. *United States v. Williams*, 504 U.S. 36, 46-47 (1992) (supervisory power of court can be used to dismiss an indictment because of misconduct before the grand jury where misconduct amounts to violation of "clear rules to ensure the integrity of the grand jury's functions") Here, the district court's denial of an evidentiary hearing to allow Ochoa to produce evidence of the government's knowledge – from review of the recordings and the statements and summaries provided by Colombian authorities – of the falsity of claims of repeated and significant participation by Ochoa in the operation of the Bernal trafficking organization is not justified by precedent. Similarly, the district court's failure to address counsel's ineffective assistance in failing to adequately pursue pretrial discovery and resolution of the issue requires further proceedings. *See Clisby v. Jones*, 960 F.2d 925 (11th Cir. 1992) (*en banc*) (habeas court's failure to address all claims creates piecemeal litigation and must be reversed).

The district court also denied Ochoa's request for an evidentiary hearing as to non-strategic omissions by trial and appellate counsel concerning jurisdictional and

43

evidentiary deficiencies in the government's case at trial. The government introduced no evidence or proffer of a strategic decision by counsel in that regard, yet the district court concluded that failure to raise even a potentially meritorious jurisdiction defense was understandable as an issue restriction measure. DE:145:8. And the district court erred in failing to address conflict of interest issues that were not resolved by the court of appeals, specifically issues pertaining to attorney Joaquin Perez's representation of witness Hector Londono. As explained in the Amended Motion, DE:10:121-22, the instant conflict of interest claim extends to Perez's representation of government witness Londono, not merely non-witness Bergonzoli. *See* CrDE:1578:5-6, 25-35 (testimony of Londono showing counsel provided by Perez as to plea deal while jointly representing Ochoa).

These issues, and other claims as to which a COA is sought, were raised in a motion to alter judgment under Fed. R. Civ. P. 59(e), but the district court did not address the merits of those issues in its Rule 59(e) ruling. In other words, even if the district court were correct in ruling that Rule 59(e) relief is unavailable due to the affirmance of prior magistrate judge rulings, a separate question is raised as to whether, reviewing such legal rulings *de novo*, they present procedural and/or constitutional grounds for appellate review and warrant the grant of a COA.

      E.      <u>Standard for issuance of a certificate of appealability</u>. A certificate of

44

appealability should be granted where – even if nearly *every* judge would agree with this district court's decisions – the case nevertheless presents procedural or constitutional issues that one or more reasonable jurists would find debatable. 28 U.S.C. § 2253. The Supreme Court has explained that a court "should not decline the application for a COA merely because it believes that the applicant will not demonstrate entitlement to relief." *Miller-El v. Cockrell*, 537 U.S. 322, 337 (2003). "[A] claim can be debatable even though *every* jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail." *Id*. at 338 (emphasis added). The COA process filters out cases lacking all reasoned argument, and allows the rest to proceed on appeal. To obtain a COA, a petitioner need not "prove, before the issuance of a COA, that some jurists would grant the petition for habeas corpus." *Id*. Instead, a petitioner must show that "jurists of reason **could disagree** with the district court's resolution of his constitutional claims or that jurists **could** conclude the issues presented are adequate to deserve encouragement to proceed further." *Id.*, at 327 (emphasis added); *see also* 28 U.S.C. § 2253(c)(2).

A COA applicant must show only that "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved differently or that the issues were 'adequate to deserve encouragement to proceed

further.'" *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893, n.4 (1983)).  Courts must resolve doubts about whether to grant a COA in favor of the movant, and may consider the severity of the penalty in making the decision.  *See Hernandez v. Johnson*, 213 F.3d 243, 248 (5th Cir. 2000); *Porter v. Gramley*, 112 F.3d 1308, 1312 (7th Cir. 1997).  A COA on *procedural* issues must issue if "jurists of reason would find it debatable ... whether the district court was correct in its procedural ruling" as to a reasonably debatable claim of a constitutional violation.  *Slack*, 529 U.S. at 484.

To determine whether a procedural error warrants the grant of a COA, the courts look to whether there is a debatable claim of procedural error and whether – if such error occurred – the record would leave a debatable issue as to whether the movant adequately *stated* a constitutional claim that was not fully and fairly resolved due to the procedural error.  *See Townsend v. Sain*, 372 U.S. 293, 312, 83 S.Ct. 745, 756-57 (1963) (focusing on whether the relevant facts have been *reliably* found after a full and fair hearing).  Because procedural errors such as those challenged here affect the content of the record, courts look to the statement of the claim, rather than proof of it, to determine if there is room for debate on whether relief could ultimately be granted.  *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *Aron v. United States*, 291 F.3d 708, 715 n.6 (11th Cir. 2002) (petitioner must "allege—not

46

prove—reasonably specific, non-conclusory facts that, if true, would entitle him to relief"). *See Bracy v. Gramley*, 520 U.S. 899, 908-09 (1997) (remanding for further proceedings based on the denial of a motion for discovery; petitioner had shown "good cause" for discovery to prove his claim, as required by 28 U.S.C. § 2254 Rule 6(a); "'[W]here specific allegations before the court show reason to believe that the petitioner may, *if the facts are fully developed*, be able to demonstrate that he is entitled to relief, *it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry*.'") (emphasis added); *Moore v. Gibson*, 195 F. 3d 1152, 1164-65 (10th Cir. 1999) (district court abused its discretion in denying leave to conduct limited discovery); *Teague v. Scott*, 60 F. 3d 1167, 1172 (5th Cir. 1995) ("Denial of an opportunity for discovery is an abuse of discretion when the discovery is necessary to fully develop the facts of a claim."); *Dyer v. United States*, 23 F.3d 1421, 1424 (8th Cir. 1994) (abuse of discretion to deny discovery where discovery could produce evidence material to determination of prejudice). The government simply cannot escape a *merits* analysis of the procedural errors in the context of this case.[7] The record shows that a certificate of appealability should issue

---

[7]  The absence of discovery and a hearing as to the *Brady* issues presents a substantial issue. *See. Ignasiak*, 667 F.3d atr 1237-38 (reversing denial of discovery; expressing "serious concerns about the government's reasons for keeping" evidence of witness misconduct and bizarre behavior "secret"; "To say that the defense would have preferred to use this information to discredit Dr. Jordan's testimony is almost

as to the procedural claims.

This is not a case of competing affidavits. The government proffered no evidence and offered no affidavits to support its self-contradictory "delusion" attack on Bernal. For the government to simply assert – without even a proffer of competing evidence – that it is incredible that Bernal was offered protection from harm and other reasonable consideration is in essence to concede that the government cannot factually dispute Bernal's claim. Where are the agents' notes? Where are the prosecutorial memos on the subject? Where are the affidavits by agents or prosecutors addressing these issues? The government surely cannot state that it was too busy to make a phone call to an agent or another prosecutor to refute even one of Bernal's sworn claims.

None of the threads of the government's case held together without Bernal and his perjury. The remaining evidence was heavily impeached and much more limited in scope than Bernal's tesimony was. Nor could others state reliably that they were part of conversations attributed to Ochoa concerning key events that the government needed to prove. Simply put, with Bernal the government had a complete case. Without Bernal the government had bits and pieces of heavily impeached and

---

certainly an understatement.").

48

contradictory evidence, supplemented by recordings that were indistinct and inconclusive.[8]

All of the claims submitted in the request for COA, whether procedural or substantive in nature, are based on underlying constitutional violations. The district court's *Clisby* violation in regard to ineffective assistance of counsel in failing to develop the record as to grand jury misconduct in the government's presentation of false evidence of Ochoa's involvement and in regard to attorney Joaquin Perez's conflict on interest in light of his representation of witness Hector Londono (a matter that the government implicitly conceded has never been addressed by any court, with only the conflict as non-witness Bergonzoli discussed on appeal) in itself warrants the grant of a COA. The district court must resolve all claims for relief raised on collateral review, regardless of whether relief is granted or denied. *Clisby v. Jones*,

---

[8]  Much less did the government have a case as to United States jurisdiction without Bernal. *See United States v. Lopez-Vanegas*, 493 F.3d 1305, 1312-13 (11th Cir. 2007) ("Our predecessor Court made clear in [*United States v. Baker*, 609 F.2d 134, 139 (5th Cir.1980)] that § 841(a)(1) *does not apply to possession outside United States territory unless the possessor intends to distribute the contraband within the United States. Baker*, 609 F.2d at 139; *see* [*United States v. Muench*, 694 F.2d 28, 33 (2d Cir.1982)] (discussing *Baker* and [*United States v. Hayes*, 653 F.2d 8, 15 (1st Cir.1981)]). Furthermore, there can be no violation of § 846 if the object of the conspiracy is not a violation of the substantive offense. 21 U.S.C. § 846 ('Any person who ... conspires to commit any offense defined in this subchapter ....'). Accordingly, where, as here, the object of the conspiracy was to possess controlled substances outside the United States with the intent to distribute outside the United States, *there is no violation of § 841(a)(1) or § 846*.") (emphasis added).

49

960 F.2d 925, 936 (11th Cir. 1992); *see also Rhode v. United States*, 583 F.3d 1289, 1291 (11th Cir. 2009) (holding that *Clisby*, which addressed a 28 U.S.C. § 2254 petition for a writ of habeas corpus, applies equally to § 2255 proceedings).  A COA is plainly warranted on *Clisby* grounds.

Subsequent to the filing of these exhibits and the sworn affidavit, Bernal, who was released from Federal Prison and was residing in Florida, filed a *pro se* request with the district court seeking permission to permanently leave the United States; thereby rendering him unavailable as a witness.  DE:92-1, 92-2.  Upon learning of this development, movant immediately filed a Verified Motion to Preserve Testimony pursuant to Rule 15 of the Federal Rules of Criminal Procedure.  DE:92.  The Government responded in opposition with the absurd and legally untenable argument that deposition rules do not apply to Section 2255 litigation.  Movant also filed, in an abundance of caution, an Amended Motion to Preserve and/or Perpetuate the testimony of Bernal pursuant to the Federal Rules of Civil Procedure.  DE:107:2 n. 2 (stating that "the instant request seeking leave to depose Alejandro Bernal-Madrigal *is not for discovery purposes, but rather to preserve and/or perpetuate this witness's testimony for use at an evidentiary hearing*") (emphasis in original).  Nevertheless, the government wrongly claimed that the preservation motion was merely for discovery, even after the witness had voluntarily met with members of movant's legal

50

team and produced his sworn affidavit filed with the district court.

Despite the arguments of movant's counsel, despite that Bernal produced a sworn affidavit filed with the district court, that the district court had yet to rule on the movant's claims, and that the district court granted Bernal permission to leave the United States, the magistrate judge denied the requests to preserve and/or perpetuate his testimony either for use at an evidentiary hearing or for purposes of appeal. DE:114. Rather, the district court seemingly agreed with the government that the requests were not for preserving and/or perpetuating Bernal's testimony, but rather for discovery. DE:114. Specifically, the magistrate judge found that the preservation issues "have been previously considered by the district court when it denied the movant's right to pursue discovery in this cause." DE:114. The magistrate judge's factual and legal conclusions defying the record are both clearly erroneous and contrary to any reasonable interpretation of the factual matters giving rise to the request. *See generally Banks v. Dretke,* 124 S.Ct. 1256 (2004) (a rule "declaring 'prosecutor may hide, defendant must seek,' is not tenable in a system constitutionally bound to accord defendants due process").

In addition to the issues discussed above as to Claims I, II, and III, pertaining to evidentiary sufficiency concerning U.S. jurisdiction over an offense involving sending drugs to Mexico and uncontradicted revelations of knowing perjury and

51

*Brady* and *Giglio* violations of substantial dimension, the district court's Order should also be revisited as to Claims IV, V, and VI.

CLAIM IV - Appellate Counsel's Failure to Raise a Fed. R. Evid. 404(b)/403 Claim. Appellate counsel's ineffective assistance in failing to raise a 404(b) issue on direct appeal warrants an evidentiary hearing, because had such an issue been raised, it would have succeeded. Contrary to the district court's contention, the inquiry does not hinge on appellate counsel's subjective beliefs as to the merits of a claim. Instead, federal courts look to the actual likelihood that a claim will succeed on appeal. *Eagle v. Linahan*, 279 F.3d 926, 943 (11th Cir. 2001) (appellate counsel's failure to argue that prosecutor violated *Batson* rule by exercising peremptory strike on basis of juror's race was ineffective assistance because claim would have succeeded on appeal). The admission of the evidence was rendered more prejudicial by the government's very clear and inappropriate use of the extrinsic evidence to argue to the jury that Ochoa's "past is his present." *United States v. Hubert*, 138 F.3d 912 (11th Cir. 1998)(in a drug conspiracy case, admission of prior act evidence from twenty, ten and just a few years prior to the charged conduct was error because the extrinsic act evidence was so attenuated that it was only offered to show a criminal disposition). Here, the extrinsic evidence not only spanned between seven and eighteen years prior to the charged offense but was also extensive and inflammatory,

52

as detailed in filings before the district court.

During closing, the government argued that Ochoa's "past is his present," referring to what it deemed a false confession given to unrelated matters seven years earlier. DE:1606:119. The government reasoned that Ochoa was once again minimizing his conduct in the present case to get away with his crimes as he had done in the past. This was a clear violation of the rules governing the use of extrinsic crimes evidence. Nonetheless, when the defense objected, the district court overruled the objection in the jury's presence. This allowed the jury to conclude that Ochoa was guilty of the present offense because he was guilty of his past offenses (i.e., "his past is his present"). The extensive nature of the extrinsic acts evidence, its inflammatory use, and the prosecution's improper use of the evidence as sanctioned by the district court, all contributed to create an issue that would likely succeed on appeal. Hence, denial of the claim without hearing from counsel at an evidentiary hearing contravenes the function of a § 2255 motion.

CLAIM V - Grand Jury Testimony. The district court asserted that the movant "has not presented any evidence suggesting that the Government knew that it was presenting false testimony." DE:145:12. The United States presented the following information against the movant during Grand Jury proceedings:

(1) That Ochoa was present in Bernal's office on March 25, 1999 and

53

was overheard "questioning Bernal concerning the delay in receiving the money back from a shipment of 8,671 kilos to Armando Valencia in Mexico."

[This information was **false** because **Ochoa was never in Bernal's office that day as per Colombian National Police surveillance logs (upon which the DEA relied)**.]

(2) That on July 16, 1999 Ochoa was overheard colluding with others to use Armando Valencia to receive the cocaine.

[This information was **false** because **Colombian National Police logs (upon which the DEA relied) reflect Ochoa engaging in a personal conversation on the phone that day and nothing else.  In fact, this conversation did not take place.**]

(3) General allegations that Ochoa goes to Bernal's office and "agrees to participate in" drug shipments and that Bernal would sit and discuss the "intricacies of the narcotics trafficking network he has with Ochoa and gain his advice."

[This information is **false**.   The **Colombian National Police's conversation summaries (upon which the DEA relied) did NOT document these conversations, and these conversations did not, in fact, take place.**]

(4) That Ochoa was present in Bernal's office on April 28, 1999 and he

54

indicated that he took part in a shipment of over 900 kilograms of cocaine.

[This information is **false** because Ochoa **was not present in Bernal's office on that date as confirmed by the Colombian National Police's logbook (upon which the DEA relied)**.]

> (5) That on July 16, 1999 Ochoa was in Bernal's office discussing a total transport of 15 tons and Ochoa specifically tells Bernal, "pass me the information, the specific quantities, the numbers, how much it will cost that you need for me to go in on this shipment."

[This specific and damaging allegation by the government before the Grand Jury is similarly **false as confirmed by Colombian National Police logbooks for this date which do NOT indicate that Ochoa engaged in any of these conversations**.]

These were the allegations made against Ochoa to the Grand Jury.  **ALL** are **false**.  Indeed, the government has never attempted to prove the veracity of any of these allegations.  Making matters worse, when Ochoa, via his attorneys, notified the government that these allegations were false, the prosecutor wrote in a letter to Ochoa's counsel that his personnel had reviewed the tapes "exhaustively" and that Ochoa was a proper candidate for extradition.

The government's position and the district court's adherence to it couch these

55

false claims as mere "inaccuracies."  An "inaccuracy" is defined as "an error, a mistake, or a slip."  Collins English Dictionary - 10th ed.  But the prosecutors admitted reviewing the transcripts and summaries before presenting the false evidence.  That evidence of knowledge by the government warranted evidentiary proceedings.  The district court's conclusion essentially is that **every single allegation** made against Ochoa during the Grand Jury proceedings was an "inaccuracy." This is untenable.  Ochoa has made more than a sufficient showing of deliberate government misconduct warranting an evidentiary hearing.  To the extent the record was not fully made prior to trial, there is abundant evidence of ineffective assistance of counsel in failing to properly pursue the issue.

CLAIM VI - Conflict of Interest.  The district court adopted the government's argument that Ochoa's allegations of ineffective assistance of counsel for laboring under a conflict of interest was litigated and rejected by this Court.  This is inaccurate, as explained at length in Ochoa's reply to the government's response in this case.  DE:23:41-42.

**CONCLUSION**

WHEREFORE, for the reasons advanced herein and in his prior pleadings and in the interest of justice, Movant Fabio Ochoa requests that the Court grant his motion for certificate of appealability.

56

Respectfully submitted,


 s/ Richard C. Klugh                               s/ Todd C. Scher
RICHARD C. KLUGH, ESQ.              TODD G. SCHER, ESQ.
Counsel for Appellant                      Counsel for Appellant
Ingraham Building                            Law Office of Todd G. Scher, P.L.
25 S.E. 2nd Avenue, Suite 1105       398 E. Dania Beach Boulevard Suite 300
Miami, Florida 33131-1605              Dania Beach, FL 33004
Tel. No. (305) 536-1191                   Tel. No. (754) 263-2349


## CERTIFICATE OF COMPLIANCE

I CERTIFY that this motion complies with the type-volume limitation of FED.
R. APP. P. 32(a)(7). According to the WordPerfect program on which it is written, the
numbered pages of this brief contain 13,625 words.


 s/  Richard C. Klugh
Richard C. Klugh

## CERTIFICATE OF SERVICE

I CERTIFY that a copy of the foregoing unopposed motion for certificate of
appealability was filed with the Clerk electronically this 12th day of   June  , 2012,
and served via e-mail upon Emily Smachetti, United States Attorney's Office, 99 N.E.
Fourth Street, Miami, Florida 33132.

 s/ Richard C. Klugh
Richard C. Klugh

57

# APPENDIX  A

Excerpt of Bernal letter to the government
DE:1, Ex. 1 (emphasis added)

EXCERPT OF BERNAL LETTER TO THE GOVERNMENT (May 28, 2007)

\* \* \*

He continued and he told me: "General Rosso Jose Serrano and the DEA in Bogota want you to help them with something". I asked him: "What's it all about and what's the benefit I am going to get from it? He explained what the recording equipment installed in an office adjacent to mine in Bogota was like, apart from a microphone installed in my desk and in my phone. *We want you to say that you entered into this office two months before because you had received information that you were being recorded from that office and that you personally saw those devices. That way Fabio Ochoa or the defense can not allege anything about that microphone or the recorded tapes because there was another way of listening to the conversations in your office, and by doing this their defense will fail.* Besides, remember that Fabio was working with the FBI and in addition to that, there was a rumor that he planed to kill you in "La Picota" because you are the main witness in his case in the event that he chooses to go to trial ("a matter which ended up being true"). *I asked him "how I am I going to benefit from all of this? What was the benefit I was going to receive? And he said "Here, we are not going to let anything happen to your family and besides that, the US government will take any of your family members that you indicate might be at risk to the United States; besides not allowing them to take any of your properties, so you and your family can continue to lead a comfortable life. I answered, "OK, you can count on me".*

1a

I came to Miami at the end of October 2001 and was sent straight to a cell in the SHU which is a separation and isolation unit.  It was there that I was able to get in touch with Fabio after one visiting day. A guard took me to his cell door; Fabio told me that he couldn't get his 20 year offer reduced, that that was the offere that they had made to him. I told him to take it because I was offered the same thing.

In February 2002 I had the first meeting with the DEA and with the officer in charge of the recordings in Colombia; I think his name was Diego. Paul Craine insisted that I should talk with the police officer, "please, he only wants to ask you two things", so I finally agreed.

The first question he asked was if the DEA was blackmailing me because on the tapes I mention US $ 2 million that were sent to a DEA officer named Richard Mayer in Mexico. The other question was if I was going to help them in case Fabio Ochoa decided to go to trial. I told him that "yes and that they could count on me", but I warned him that I had been in the office adjacent to mine in Bogota only eight days before, then his expression told me everything. He didn't like it, but I couldn't tell him about how I was told to say that it was two months before because everybody involved in the "Operation Millenium" was going to think that I kept quiet and that I continued holding meetings in my office.  Nobody was going to believe that and I was going to look really bad.

*I remember that you (Ricardo) and Ed Ryan asked me several times  if I had been in that office eight days before, and if I was sure about that. We go to trial and*

2a

*under oath I lie and testify about the eight days, I point to the screen and I indicate on it according to what I was told by you guys and I give those answers before the jury knowing that I never had entered into that office and that I had not seen any of that equipment and I didn't know anything about the recordings, but I fulfilled my promise to you guys.*

Eight days after I was sentenced, the marshals took me down to a debriefing. DEA Officer Minh T. Nguyen and a female translator from Panama who was accompanying Minh were present. They asked me to sign a document whereby I acknowledged that Agent Minh was in charge of my case and that I could not talk to anybody during one year without his prior approval. The female translator told me essentially "you belong to agent Minh". I told her that there was no problem and I signed the documents.

After I signed the documents I asked Minh why they didn't keep their word about giving me a 50% reduction off my sentence and Minh answers: "Alejandro, what really bothers us is when people think that they are more clever than us". Minh, I asked him "what are you talking about? He said: "Alejandro, we unplugged the equipments that were in the office adjacent to yours in Bogota a month and a half before 'Operation Milennium', so you couldn't have entered that office eight days before and have seen that equipment". *At that point I realized that you Ricardo, Minh and everybody knew that I was lying at the trial,* but you didn't know why. The reason is that for me, I assumed these were understood values, and that if I was helping you guys to succeed in the trial, and that if the DEA in Bogota and General

3a

Rosso Jose Serrano had asked me that favor, in exchange for what I previously mentioned, it is because all of you knew it, and that's the reason why I didn't say anything and I complied with what I had promised.

Five months before, I mentioned that issue to Minh in front of the DEA, Mia officer, a Korean lady who I remember was pregnant. Minh gave me his card and told me: "this is the first time that I give you my card, write to me if you want". I told him "Yes", that I was going to write to him because I wanted to explain all of this. That was the reason why I had lied at trial. Minh emphatically told me that that was one of the reasons why journalist Julio Sanchez Cristo – one of the best Colombian journalists – wanted to interview me and that the Ochoa family was giving money to Julio Sanchez Cristo in order to interview me and get information from me different to what I had said and in that way catch me saying something imprecise or contrary to my testimony in the trial, this way the Ochoas were going to take this in order to request a new trial for Fabio and disfavor me as a witness for having lied or provided false testimony during trial.

* * *

At the end I pleaded guilty in order to help you guys, so that at Fabio Ochoa's trial, Roy Black couldn't say that I was testifying against Ochoa because this charge was dismissed which was not necessary, Ricardo, simply to be able to tell the defense: "No, Mr. Black, we dismissed that charge because the extradition treaty forbids it and that's all".

*However, I accepted and I did everything you wanted in order to help and*

4a

*benefit you guys with the entire understanding that in my sentence and then in my rule 35, you were going to release me, that I was going to keep my properties or you were going to make the arrangements with Colombia so I could keep them and you were going also to give visas to me and to Blanca, my wife.*

*You didn't do any of this and I remain here in jail, my wife hasn't gotten a visa and I don't have my properties in Colombia either.*

Ricardo, thanks to you, after being sentenced to 174 months and a half and after staying 2 years and 2 months alone in the Special Housing Unit (SHU), I was sent to the Federal Correction Institute in Miami in order to be close to my children and my family and also, in case the government, FBI, DEA or Customs may need me for something, as it turned out that they did.

On February 18th 2005, a year and a half after I was sentenced, I was picked up from the F.C.I in Miami and I was taken to the F.D.C Building in downtown Miami for my sentence reduction and I was again placed in solitary confinement (SHU) for a total of 5 months.

In June 2005 I had a meeting with agent Minh, Pete - his supervisor - and my lawyer, Ruben Oliva. They called you on the phone and Ruben asked you: "Ricardo, we have a hearing for the sentence reduction regarding Alejandro Bernal next July 17th, what are you going to request for him? You told them that you were going to request a 50% reduction and that it was well deserved. Besides, remember the promise you made me on the day I signed the document for Minh, eight days after I was sentenced and Minh puts me on the phone with you and you told me: "Alejandro,

5a

I am very disappointed at the sentence judge Moore gave you, but don't worry, within a year, when we give you your sentence reduction, I am going to request the 50% so you can be released".

*Remember also that I was promised a 50% sentence reduction before testifying against Fabio, but I couldn't get it before my testimony because then the defense could use it to say that I was testifying against Fabio because of the sentence reduction I received.*

I remember well that I thanked you. On July 17th 2005, when I went to Court before Judge Moore, you didn't go that day, they said that you were in another courtroom, but Glenn Alexander – Prosecutor in the Milenium case and who worked in Washington – went accompanied by agent Minh Nguyen and they only requested a 33% reduction. After hearing from my lawyer, Ruben Oliva, the judge said he would think about it.

When the judge asked me, just as he did on the day of my sentencing, if I wanted to say something, Oliva advised me not to say anything because it's all recorded and Fabio's defense could take what I said, and compare it with what I said at trial so they could get a new trial and he also told me to take it easy because he was going to fix it with you guys. I agreed because imagine if I say all of this I have written to the judge and if it reaches Roy and the Ochoa Family.

In February 2006, tired of listening to Ruben Oliva's lies, I decided to write judge Moore reminding him about his promise that he was going to reduce my sentence but that he was going to think about. He resolved it only on March 29th 2006

6a

by giving me only 17% which added to the 30% I received on the day of my sentence, totaled 50%. How was the Judge going to give me a 50% if the government didn't request him to do so which was what the government promised me? Ricardo, this is not what you and my lawyer agreed with me and what you had promised me.

*I remember that when you were preparing me for the trial, Glenn Alexander asked me in front of you and Dick Gregory: "Alejandro, if Mr. Black asks you whether we, the US Government, offered you something in exchange for testifying against Fabio Ochoa, what are you going to say? I answered: "Of course, my freedom". I remember seeing Glenn Alexander laughing very enthusiastically for the first time and then he told me: "No Alejandro, You can not say that. What you have to say is that we are going to present a motion to Judge Moore so he'll consider your cooperation and give you a meaningful reduction in your sentence, but we have not promised you anything, OK, be aware, don't say anything else". Then I asked him: "And then who can guarantee me that the judge is actually going to give me something after I say this? He answered: "Look, Alejandro, that's how the US legal system works. If we don't fulfill our agreements, the system will fall down and it won't work". I asked Oliva who told me exactly the same thing. That's exactly what I did and said during the trial, well I did and I said exactly what you guys asked me to do and say. I also remember as if it happened yesterday how happy you guys were when I finished testifying; you raised your hands and congratulated each other in the court as if we had made a goal in a soccer game. Minh Nguyen would make the victory sign pointing at me. I felt very happy for you guys; but although I wanted to*

7a

*look strong, I was destroyed inside. There's no doubt that it has been the hardest test in my life. I wanted the earth to open and swallow me. I felt as if I were burning inside.*

On the first day I testified, my counselor in F.D.C Miami, Mrs. Santiago saw that I was feeling so bad that she asked me: "Bernal, What's wrong? I said: "Mrs. Santiago, I am not capable of going on with this; I will no longer go to that trial. Let them give me those 30 years". She said: "What I am going to do is illegal because you are in a trial and you can not speak with the Prosecutor, with the DEA or with your lawyer until you finish testifying, but since this is very serious I am going to allow you to communicate because this is very serious". *I spoke with you and with Minh Nguyen, I felt very bad, as a human being and as a person, etc,. It didn't matter if Fabio was cooperating with the FBI before the "Operation Millenium", it was me. You told me: "Alejandro, we have been working together many months for this trial, please calm down, we are going to see what we can do in order to stop the trial for some days while you get better. I am going to speak with Oliva and I am going to ask him to see you; don't worry, everything is going to be fine and you are going to recover your freedom. Don't worry.*

*That evening, Mrs. Santiago sent me a Psychologist to talk to me at the SHU. I cried like a little boy all night long. I even thought about killing myself, but I asked God to give me strength to go on.*

On the next day, at 5 AM, the marshals again took me to the Court. Ruben Oliva came to see me to the cell where I was in the first floor. Ruben told me:

*"Alejandro, I am here to see you because Ricardo called me and he told me that you were feeling very bad. What I am doing here is illegal because I can't speak with you until you finish testifying, but I am going to tell you two things that I hope will make you feel better.* Fabio Ochoa was cooperating with the FBI, I am going to send you some papers (which he sent me later on. It was an interview of Baruch Vega by "The Saint Petersburg News" made on the same day the trial against Ochoa started, it was May 4th or 5th - 2003 where Baruch Vega confirmed what Enrique Mancera, Danilo Gonzalez and Carlos Castano had told me about Fabio and his cooperation with the FBI). *The second is, Alejandro, that you are going to be released and you can have another chance at life. I can't promise that you are going to get it at your sentencing, but you will through the Rule 35. Besides, you shot Fabio Ochoa yesterday in the Court and the enemy must not remain wounded, kill him at once. You are not going to be a better person if you don't go to trial any longer. What you said is said. Pluck up courage and kill him at once. Think about you and your family, Fabio hasn't ever thought about you, except to kill you in La Picota".* I told him "Ok. I am going to go on".*

I remember that I entered the courtroom very, very early. There was nobody there, I sat down, then Oliva came again and he told me: "Alejo, I have to speak quickly with you because nobody can see me here because like I told you before, this is illegal, but don't worry because they are not going to let anybody in until I get out. *They are going to suspend the trial for some days until you get better; they are going to make up something, you'll see. Don't worry, this is meant for you to be more sure*

9a

*of yourself". That's what happened. Judge Moore said that he was going to postpone the trial until the next day because a female juror's child got sick and she could not attend the trial. On the next day the child was still sick.*

*The trial re-started after some days when I was feeling more recovered and we know the result, you guys succeeded. Everybody feels happy, but what about me? I continue in prison here in the F.C.I. in Miami.*

\* \* \*

Ricardo, I fulfilled all my part of the agreement, you guys succeeded in the trial, you thanked me for my intervention. I also got pleased when I read the news about the government benefits you got as a result of the "Operation Millenium", but Ricardo, what about me? Blanca, my wife doesn't even have a driver's license. Thank God my children are North American citizens otherwise what would happen to them?

*Ricardo, if having lied in the trial about entering the office adjacent to mine in Bogota wouldn't have been important for you guys, you simply wouldn't have let me lie, and when you were preparing me for the trial, you should have told me: "Alejandro, skip that part, to say that before the jury is not necessary, and that's all, and I wouldn't have said it. The same way you guys would correct me and tell me how to talk, you could have told me that. That's why I always believed that it was very important for you, I didn't want to confront you guys with it so you wouldn't get compromised; but after the trial when Minh told me that you guys knew that the recording equipment had all been unplugged a month and a half before the "Operation Millenium", that's when I realized that you all knew that I was lying.* I

10a

want to clarify that the DEA in Bogota and General Serrano didn't talk with me, it was Colonel Gonzalez who advised me about this issue or operation stage.

The DEA in Bogota, Nick Collen and Paul Craine had a meeting with my wife and they told her that they were going to bring me over immediately  and that I was going to be in jail for five years if I helped them, specifically regarding the tapes. At that time, my lawyer was Dan Foreman; he arranged the meeting between Blanca, Nick and Paul in Bogota. Dan advised me not to do anything until arriving here because they couldn't make a five year offer, only the Prosecutor and the Judge could do that.

Ricardo, I also want to make sure that if I am writing about this serious issue it is not to extort you because I had alread told Minh that I wanted to explain everything and he authorized me to write everything very clear and that it didn't matter if I write in Spanish because he had a trustworthy translator. *Besides, Ricardo, I have been waiting for four years since the end of the trial for you guys to fulfill what you promised and nothing has happened.*

Ruben Oliva knows all of this and it is in writing in his hands because you sent him an e-mail saying that everything had to be through Oliva. I did it that way and everything continues the same. It seems Oliva didn't explain anything or I don't know what happened. Remember when my brother went to see you at the U.S Attorney's Office, it was just to say hello and being in contact with you and all of this could have been cleared up long ago, but it was you who always wanted everything to be through Oliva.

In addition, on the day of the Grand Jury, Minh promised me in front of Oliva that he would take me from the FCI to the street so I didn't have to go through Immigration.

*I do know one thing, that everything I did, said and testified to had only one purpose; it was meant for you to succeed in the trial, that was the most important thing and I did my part, I even lied under oath to make sure you succeeded. Now you must fulfill what you promised and take me out of jail and get back my properties and get visas for my wife – Blanca - and for me.*

*Ricardo, I am not asking for anything you guys didn't promise from the beginning. I am informing Minh about this by means of a letter.*

*I hope after this letter everything is clear. I ask you to help me and fulfill what you always promised me regarding my freedom, my properties and the visas you promised for me and my wife.*

12a