NO. 11-15620-F

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

FABIO OCHOA,
*Petitioner/appellant,*

v.

UNITED STATES OF AMERICA,
*Respondent/appellee.*

On Appeal from the United States District Court
for the Southern District of Florida

APPELLANT'S REPLY TO GOVERNMENT'S RESPONSE
TO MOTION FOR CERTIFICATE OF APPEALABILITY

RICHARD C. KLUGH, ESQ.
Counsel for Appellant
Ingraham Building
25 S.E. 2nd Avenue, Suite 1105
Miami, Florida 33131
Tel. No. (305) 536-1191

TODD G. SCHER, ESQ.
Counsel for Appellant
Law Office of Todd G. Scher, P.L.
398 E. Dania Beach Boulevard Suite 300
Dania Beach, Florida 33004
Tel. No. (754) 263-2349

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

### Fabio Ochoa v. United States
### Case No. 11-15620-F

Appellant, Fabio Ochoa, files this Certificate of Interested Persons and Corporate Disclosure Statement, listing the parties and entities interested in this appeal, as required by 11th Cir. R. 26.1.

Aldazabal, Mauricio

American Civil Liberties Union of Florida, Inc.

Bergendahl, John

Bergonzoli, Nicholas

Black, Roy

Blue, John

Cardena, Carlos

Castiblanco, Jaime

Del Toro, Ricardo

Docobo, Richard

Dominguez, Humberto

Ferrer, Wifredo

Forman, Daniel

*Ochoa v. United States*
Case No. 11-15620

Garber, Hon. Barry

Gonzalez, Manuel

Klugh, Richard C.

Lewis, Neal R.

Marshall, Randall C.

Matters, Michael

McLaughlin, James A.

Moore, Hon. K. Michael Moore

Ochoa, Freddy Ivan

Perdomo, Sergio

Perez, Joaquin

Perczek, Jackie

Petruzzi, Paul

Ramsey, Rachael

Ryan, Edward

Scher, Todd

Schultz, Anne

*Ochoa v. United States*
Case No. 11-15620

Smachetti, Emily M.

Srebnick, Howard

Strafer, Richard

Sutton, Stacey

Toro, Maurucio

Santiago Velez

Walbolt, Esq., Sylvia

Walsh, Michelle

Monica S. Wetzel

C-3 of 3

UNITED STATES COURT OF APPEALS
ELEVENTH CIRCUIT

No. 11-15620-F

FABIO OCHOA,

      Movant/Appellant,

vs.

UNITED STATES OF AMERICA,

      Respondent/Appellee.

_____/

**APPELLANT'S REPLY TO GOVERNMENT'S RESPONSE
TO MOTION FOR CERTIFICATE OF APPEALABILITY**

Appellant, Fabio Ochoa, through undersigned counsel, hereby replies to the government's response to his motion for certificate of appealability (COA) under 28 U.S.C. § 2253(c) and Fed. R. App. P. 22(b), and states:

1. <u>Overview</u>. The government's response to the motion for COA repeats several significant mistakes made in the district court regarding the scope of the claims raised and the procedural rights of the defendant. With regard to the standard applicable to granting a COA to review claims resolved on the merits *without* an evidentiary hearing, the law is well established that the appellant's burden is *not* to prove that he will win after the evidentiary hearing is conducted, but to prove that the motion *states* a facially valid claim that is not conclusively refuted by the record. As

the Supreme Court explained in *Miller-El v. Cockrell*, 537 U.S. 322, 123 S.Ct. 1029 (2003), the COA "threshold inquiry does not require full consideration of the factual or legal bases adduced in support of the claims. In fact, the statute *forbids* it;" instead the test for a COA is simple: could jurists of reason disagree with the summary resolution of the case without an evidentiary hearing and do the issues deserve encouragement to proceed further? *Id*. 537 U.S. at 336, 123 S.Ct. at 1039; *see id*. 537 U.S. at 338, 123 S.Ct. at 1040 ("We do not require petitioner to prove, before the issuance of a COA, that some jurists would grant the petition for habeas corpus.").

Contrary to the government, the COA process is not about determining ultimate relief on, or denial of, the § 2255 motion, but rather whether, in the absence of an evidentiary hearing, the substantial issues raised regarding the government's key witness Alejandro Bernal; conflict of interest and other failures of trial and appellate counsel to provide effective representation; government presentation of false evidence to the grand jury; and jurisdictional defects in the prosecution, have been fully and fairly resolved.[1]

The government argues that none of the procedural rulings by the district court – including the denial of an evidentiary hearing; the striking of supplemental

---

[1]  Contrary to the government, there is no sentencing error claim raised as part of the motion for COA.  *See* Gov't Resp. 15-17 (discussing § 2255 claim of sentencing error that movant abandoned in the district court).

submissions in support of the claims, the denial of leave to supplement the § 2255 motion with newly discovered evidence of related *Brady/Giglio* violations; the failure to comply with the requirement of *de novo* review of magistrate judge determinations that foreclosed relief; the failure to address all claims; the failure to afford the parties notice and an opportunity to address the trial court regarding withdrawal of the referral to a magistrate judge after hearings were conducted by the magistrate judge; and the failure to consider record evidence supporting the claims – are even capable of the grant of a COA.  Gov't Resp. 7 (arguing that denial of an evidentiary hearing, striking of evidence, denial of leave to amend and other claims are "nonconstitutional, non-dispositive procedural arguments" that cannot be reviewed on appeal).  The government's confusion on this matter is not readily understandable nor does the government offer any case or even non-precedential support for its novel position.

Instead, while the complete foreclosure of consideration of the supplemental claims should be reviewed for a combination of arguable procedural error and facial merit of the claim, *see Slack v. McDaniel*, 529 U.S. 473, 120 S.Ct. 1595 (2000), the standard of COA review applicable to denial of an evidentiary hearing and similar errors affecting the content of the record are subject to more precise review standards, none of which require a showing that even absent the excluded evidence, the movant must have shown enough evidence to prevail.  Instead, the COA standards applicable to denial of an evidentiary hearing are the same here as they are in any other § 2255

3

case involving a summary resolution of the claims. A COA is required in this context based on the unrefuted assertions in the motion to vacate. *See Gomez-Diaz v. United States*, 433 F.3d 788, 790 (11th Cir. 2005). An evidentiary hearing is to be held where "the petitioner alleges facts that, if true, would entitle him to relief." *Aron v. United States*, 291 F.3d 708, 714-15 (11th Cir. 2002) (quotation omitted). The question for purposes of issuance of a COA is: could reasonable jurists disagree whether "the petitioner's allegations are affirmatively contradicted by the record, or the claims are patently frivolous[?]" *Id.* at 715. The litigation history of this case – despite the record restrictions imposed by the magistrate judge who handled the bulk of the case – shows clearly that the claims stated are not contradicted by the record; they are instead affirmatively supported by the record in large part and are rebutted by no contrary affidavits.

　　2.　　Government's interpretation of the factual record as affecting the substantiality of the constitutional claims raised in the § 2255 motion. The government asserts overwhelming evidence of Ochoa's guilt in this case in an apparent effort to dismiss the significance of the merits of the § 2255 claims. Considered independently, as is required at this pre-hearing stage of the case, the government's evidence as to Ochoa was instead burdened with severe credibility problems as to any possible drug involvement by Ochoa; and the evidence was

4

plainly insubstantial as to any intention by Ochoa to send drugs to the United States.

The government glosses over those weaknesses by recharacterizing evidence of financial dealings between Ochoa and Bernal as having a presupposed drug connection. Essentially, the government's evidence was that Ochoa paid a debt owed by Bernal and Bernal promised to repay Ochoa. The government argues that this debt concerned an old, failed Bernal drug deal with Nicolas Bergonzoli, but the trial transcript, and the citations to the record by the government, Gov't Resp. 2 (citing CrDE:1415:12-13, 50; CrDE:1573:46; CrDE:1574:44), do not show that Bernal informed Ochoa that the debt paid was related to drugs, nor did recordings support such a *post hoc* supposition.[2]

The government argues that Ochoa and an associate somehow "closely" monitored Bernal's activities to "ensure" repayment, presumably by making a total

---

[2] Nor is there anything more than argument – with neither overwhelming nor any other level of evidence – about Bernal's telling Ochoa that he would use drug proceeds to repay the debt. Gov't Resp. 3 (citing CrDE:1412:17-18; CrDE:1573:57-60). Instead, Bernal claimed at trial that he merely asked for time to repay Ochoa, because at that time Bernal was not actively trafficking. At most, Bernal's supposed statements – none of which were corroborated by any evidence, recordings, or other testimoiny – were ambiguous and suggested at worst that Bernal might repay with dirty money. Notably, that did not convert Ochoa into a drug conspirator, much less did it notify Ochoa of any plan to send drugs to the United States. Thus, the core theory of the government's case – that Ochoa might be repaid with drug money – was one that did not encompass Ochoa's guilt of drug trafficking; nor did it involve any other violation of United States laws, as the reach of federal money laundering statutes does not extend to transactions in Colombia.

5

of just *three* visits to Bernal's office in the course of two years.  Gov't Resp. 3 (citing CrDE:1412:25-26, 40-42; CrDE:1414:57; CrDE:1415:13-17, 30-32).  But neither the cited portions of the transcript nor the rest of the record confirms the theory that having lunch a few times with Bernal, who supposedly was heavily indebted to Ochoa, constituted close monitoring of Bernal's activities.  The government's overstatement of its trial evidence does not make that evidence overwhelming.

Notably, the government ignores testimony that was shown at trial to be false, including the claim by Hector Londono that Ochoa took a flight with Bernal to Bogota to discuss drugs.  On cross-examination, Londono's claim was shown to be false, in that it was another person, not Ochoa, who traveled with Bernal, i.e., Hermes Betancur, a member of the Arcadia drug group with no connection to Ochoa.  CrDE:1578:7-16, 45-46.  Nor do any of the other record citations by the government support the claim of overwhelming evidence.  Instead, apart from a series of incredible cooperating witnesses, the case against Ochoa consisted of: (1) testimony concerning financial dealings with Bernal; and (2) claims, principally by Bernal, that Ochoa's voice could be heard in a few instances in the Bernal office recordings.[3]

The government's claim that Ochoa gave Bernal support with recalcitrant

---

[3]  *See*  CrDE:1606:119-21;  CrDE:1511:50-57;  CrDE:1573:8-19; CrDE:1412:11-12, 51; CrDE:1413:22-25

suppliers of cocaine is unsupported in the recordings, resting instead on the cooperating witnesses who were shown to have lied about the particulars of this claim and to be admitted perjurers. That was hardly overwhelming evidence of anything. Much less was it overwhelming support of the theory that Ochoa knew that the United States was the destination of drugs being sold elsewhere.

Ultimately, the success of the government's claims against Ochoa rested on *Bernal's* testimony falsely asserting that the United States was the destination of drugs and the heavily impeached testimony of three of Bernal's associates that Ochoa was aware of or had some financial interest in drug deals. The level of discrediting of the government's witnesses is exemplified by the cross-examination of Santiago Velez, who admitted to committing perjury in Ochoa's trial when he was caught falsely denying his most recent prior incident of perjury in a federal trial in Atlanta. CrDE:1578:98-116; CrDE:1579:13-27. Velez also was shown to have lied in making other claims, that were abandoned by the government when Velez left the witness stand, concerning specific drug transactions that Ochoa was in no way involved with, including by a showing of video proof that Velez's claim that Ochoa met with Mexican trafficker Alberto Gallego was false. CrDE:1579:22-27.

Even absent the undermining of the government's case effected by the new revelations of Bernal's perjury and related admissions – the record shows the opposite

of an overwhelming-evidence case, in terms of testimony, recordings, and documents. Apart from the impeached witnesses seeking to link Ochoa generally to Bernal's activities, and Bernal's claims (that he later conceded were false) regarding a U.S. destination for the shipments, the remaining evidence was equally problematic for the government.  The overwhelming weight of the audiotape evidence – 1,013 relevant tapes in which Ochoa says nothing about drugs or drug financing – are notable because none of the other conspirators, speaking in open and candid detail about their drug dealings, ever says anything that the government interpreted as identifying Ochoa as a participant.  *See* CrDE:1511:44-46. 63-67.  The tapes simply never reference Fabio Ochoa.  Even in the single recording where Ochoa's voice was identified by Bernal,[4] only a random comment relating to money, not shipment of drugs to the United States, was asserted by the government.  CrDE:1606:119-21.

Equally underwhelming for the government was the documentary evidence. Indeed, in the entirety of the documentary discovery – over one hundred thousand documents with all the accounting and computers records of all 40-plus defendants, with dates of dealings and lists of shipments already made and those who were planned – there was not a single mention of Ochoa or an indication of shipment to the

---

[4] The defense not only objected to the authentication of the tapes, but also strongly contested to the identification of voices and statements imputed by Bernal and other witnesses. *See*, *e.g.*, CrDE:1412:60-63.

United States. And these documents simply did not support the otherwise heavily impeached testimony of witnesses against Ochoa. Also, among 15,000 pager messages exchanged between most of the defendants, nothing showed any connection to Ochoa. CrDE:1511:69, 75-77, 81.

The government's claim of overwhelming evidence boils down to the testimony of three people who admitted perjury during trial and one – the star witness, Bernal – whose perjury (and delusions) went undisclosed until the government began releasing letters Bernal meant never to be seen.

3.    <u>Ineffective assistance of counsel</u>. The claims of ineffective assistance of counsel were sufficiently stated to require an evidentiary hearing. First, the government mistakes the conflict of interest claim raised on direct appeal for the conflict of interest claim raised in the § 2255 motion. The district court erred in failing to address conflict of interest issues that were not resolved by this Court on direct appeal, specifically issues pertaining to attorney Joaquin Perez's representation of witness Hector Londono. As the movant explained in his motion, DE:10:121-22, his § 2255 claim of conflict of interest claim extends to Perez's representation of government witness Londono, not merely non-witness Bergonzoli. *See* CrDE:1578:5-6, 25-35 (testimony of Londono showing counsel provided by Perez as to plea deal while jointly representing Ochoa). The district court's failure to

9

address this conflict claim at all is a clear violation of *Clisby v. Jones*, 960 F.2d 925, 936 (11th Cir. 1992) (requiring that the district court resolve all claims on habeas review). The government's response repeats this error, ignoring the Londono conflict of interest. Gov't Resp. 14-15 (mentioning only Bergonzoli, not Londono). The district court also denied Ochoa's request for an evidentiary hearing as to non-strategic omissions by trial and appellate counsel concerning the failure to raise jurisdictional and evidentiary errors. The government introduced no evidence or proffer of a strategic decision made by counsel in that regard, yet the district court concluded that failure to raise even meritorious jurisdictional and evidentiary issues on appeal was understandable as an issue restriction measure. DE:145:8.

4. <u>Facially valid grand jury claims</u>. The government conceded making false material statements to the grand jury, but denied that *intentional* falsity could be proven. The record shows a substantial basis for finding that the number and significance of the false statements, and particularly in asserting to the grand jury that the government had substantial incriminating recorded evidence, when it had none and merely knew of Ochoa's association with some of the defendants, was itself sufficient to require evidentiary proceedings. The further discovery of concealment of *Brady* material concerning primary trial witness Alejandro Bernal, both as to assertions he made that were confirmed by the government and others that were

10

merely unrebutted by the government, showed that there was a sufficient basis for evidentiary proceedings as to the grand jury misconduct. The government's claims regarding false statements to the grand jury rest on an mere assumption that the § 2255 claims specifying the knowing nature of the misstatements, including bold lies about the content of recordings in order to convince the grand jury of objective evidence incriminating Ochoa, are false. Where the government filed no affidavit in support of its unintentional lie theory and where pretrial proceedings did not test the credibility of any government witness, an evidentiary hearing was required.

5.    <u>Issues relating to essential witness Bernal, including manipulation of jurisdictional evidence, presentation of false testimony, concealing delusional allegations by Bernal against the movant, and concealing multiple factors undermining the reliability of Bernal's testimony</u>. The multiple issues pertaining to essential government witness Alejandro Bernal require that a COA be granted.

(a)    *Sua sponte dismissal of the § 2255 motion upon cancelling referral to magistrate judge.*

The district court's decision to deprive the movant of rights statutorily mandated as to a movant who has litigated a post-conviction motion before a magistrate judge (here, for more than two years), in violation of direct requirements also of the federal habeas rules of procedure, compel the grant of a COA, if for no

11

other reason than the unprecedented nature of the district court's action that essentially pulled the rug out from the litigants who anticipated having an opportunity to fully address, and obtain *de novo* review of, the magistrate judge's rulings restricting discovery, restricting access to evidence, failing to preserve evidence, denying an evidentiary hearing, and denying motions to supplement the record and the § 2255 claims.

By depriving the movant of the expected magistrate judge report and the opportunity to seek *de novo* review from it, and by simultaneously failing to opine or otherwise state reasons in support of any prior ruling by the magistrate judge, the district court turned the magistrate judge's initial and preliminary determinations into final unreviewable rulings, depriving the movant of his right to district court resolution of his claims.  The government asserts that Ochoa appealed some of the magistrate judge rulings under S.D. Fla. Local Rule 4.[5]  But those appeals did not encompass all of the magistrate judge rulings at issue and, most importantly, were not afforded the *de novo* review to which a movant is entitled upon issuance of the magistrate judge's final report, under 28 U.S.C. § 636.  So, the unique result of

---

[5]  The appeals filed under S.D. Fla. Local Rule 4 were limited to seeking district court reconsideration of a magistrate judge ruling on a "pretrial matter," under a deferential standard.

12

converting, by means of withdrawing the referral, the magistrate judge's limited authority into final unreviewable authority over the § 2255 motion violated § 636 and the Rules Governing § 2255 Proceedings and caused the movant to be deprived of his right to an Article III judge's *de novo* review of the crucial issues. That statutory and constitutional violation must be remedied by a remand to the district court with reassignment of the case so as to assure that the independent judicial decisionmaking required under the statute is meaningfully exercised.

The procedural requirements applicable to a § 2255 movant in the Southern District of Florida are found at the confluence of three streams of law – 28 U.S.C. § 2255 (the statute that supplants the ancient writ of *habeas corpus*); the Rules Governing Section 2255 Proceedings for the United States District Courts, as passed by Congress and adopted by the Supreme Court in 1976; and S.D. Fla. Local Rule 88.2.

Section 2255 provides that post-conviction requests for relief are to be brought in "the court which imposed the sentence." 28 U.S.C. § 2255(a). The Rules Governing § 2255 Proceedings require that the case be assigned to the judge who imposed the conviction and sentence. Specifically, Rule 4 (entitled "Preliminary Review") provides that "[t]he clerk must promptly forward the motion to the judge who conducted the trial and imposed sentence[.]" Rules Governing Section 2255

13

Proceedings, Rule 4(a).  Subsection (b) of Rule 4, the "Preliminary Review" rule, then provides that "the judge" who receives the motion from the clerk per subsection (a) "must promptly examine it."  In conducting this examination, the trial judge, relying on his or her familiarity with the case, should determine "[i]f it plainly appears" from the record  "that the moving party is not entitled to relief," and if so, the judge should dismiss the motion.[6]  Where the judge who tried the case cannot conclusively determine that the case should be dismissed, Rule 4(b) provides that "the judge must order the United States attorney to file an answer, motion, or other response[.]"

The Rules Governing § 2255 Proceedings also set out the proper role for a federal magistrate judge to play in such proceedings.  Specifically, Rule 8 (entitled "Evidentiary Hearing") requires that *the judge* (*i.e.*, the trial judge who did the preliminary examination and who ordered the responsive pleading from the government) "must review the answer, any transcripts and records of prior proceedings, and any material submitted under Rule 7 to determine whether an evidentiary hearing is warranted."  Rules Governing § 2255 Proceedings, Rule 8(a).

---

[6] Section 2255 makes clear that the trial judge should order such dismissal only where "the motion and the files and records of the case ***conclusively show*** that the prisoner is entitled to no relief." 28 U.S.C. §2255(b) (emphasis added).  The movant is "***not*** required to allege facts in his petition that would have been equivalent to the type of proof that one would expect in an evidentiary hearing." *Price v. Allen*, 679 F.3d 1315, 1326 n. 9 (11th Cir. 2012) (emphasis added).

Subsection (b) of Rule 8 provides that, where the trial judge determines that an evidentiary hearing is required the "judge may, under 28 U.S.C. § 636(b), refer the motion to a Magistrate Judge to conduct hearings and to file proposed findings of fact and recommendations for disposition." That subsection further requires that the parties be given an opportunity to file objections to the magistrate judge's proposed findings, and that the trial judge "***must determine de novo*** any proposed finding or recommendation to which objection is made." Rules Governing §2255 Proceedings, Rule 8(b) (emphasis added).[7]

> (b)     *Ochoa's persistent efforts to discover, supplement the record with, and argue the legal implications of Bernal's delusional claims against Ochoa and false assertions regarding U.S. jurisdiction.*

The government disputes efforts by Ochoa to introduce the issue of Bernal's delusional 9/11 claims. *See* Gov't Resp. 5  But in June 2009, Ochoa's counsel was able to obtain an affidavit from Bernal on the issue and filed it in an attempt to present this supplemented claim both for its independent merit under § 2255 and for its evidentiary value in relation to the other § 2255 claims. DE:90, 99, 131. The trial court's subsequent decision, DE:133, that Ochoa's efforts to bring the facts to light regarding the hidden 9/11 claims, that were clearly part of the government's effort to

---

[7]  The motion to amend filed by the movant differed from cases involving newly raised issues, as opposed to offering factual development pertaining to the mishandling and testimonial manipulation of star witness Bernal.

manipulate the testimony, and preserve the credibility, of Bernal, were untimely is subject to debate among reasonable jurists.

Similarly, the government's theory that arguments regarding Bernal's lies about U.S. jurisdiction and Ochoa's assertion of need for a searching record review of the inadequacy of evidence of that element of the offenses were not presented to the district court is inconsistent with the record.  In the amended § 2255 motion filed prior to any government response, DE:10, Ochoa set forth Bernal's lies about jurisdiction and argued in the motion, DE:10:18, 20-21, and at a status conference before the magistrate judge on May 19, 2008, *see* DE:39:12, that the evidence was manipulated and insufficient as to the U.S. destination of the drugs.  Contrary to the government, both the totality of the Bernal claims and the arguments regarding the final destination of the drugs were not new claims, but were timely and diligently raised and investigated and appropriately and responsibly supported with documentary evidence that was never refuted by the government, with the government failing to file even a single affidavit in opposition to the claims.  DE:10; DE:39; DE:48.

Regarding the Bernal 9/11 evidence, the government's initial disclosures of references to 9/11 did not show a link to Ochoa.  *See* DE:10-2:11 (Bernal's initial post-trial references to the terrorism interviews did not mention Ochoa, but merely

16

that the government had told him to stay away from national security issues).  Later,
as more documents came out, and the government eventually provided a DEA-6
report of Bernal claiming Ochoa's control over the 9/11 events, Ochoa's counsel
pursued the matter vigorously as it became integral to the credibility of the rest of
Bernal's revelations as to how the government controlled his testimony.  The
government's admission of how it suppressed Bernal's references to Ochoa and 9/11
dovetailed with the entirety of the evidence of *Brady* and *Giglio* violations.
Remarkably, however, the district court makes no mention of the matter at all in the
order denying relief.  And even now in this Court, the government claims this
centrally important information, corroborative of the entire Bernal narrative of
government mishandling of his testimony, should somehow be kept out of the
discussion.  The interests of justice run directly contrary to the government's
position.[8]

The actions of Ochoa's § 2255 counsel in bringing to light and seeking to
resolve the issue of Bernal's delusional 9/11 claims – that the government concedes

---

[8]  The absence of discovery and a hearing as to the *Brady* issues presents a
substantial question.  *See United States v. Ignasiak*, 667 F.3d 1217, 1237-38 (11th
Cir. 2012) (reversing denial of discovery; expressing "serious concerns about the
government's reasons for keeping" evidence of witness misconduct and bizarre
behavior "secret"; "To say that the defense would have preferred to use this
information to discredit Dr. Jordan's testimony is almost certainly an
understatement.") (citing, inter alia, *United States v. Ochoa–Vasquez*, 428 F.3d 1015,
1029-30 (11th Cir.2005)).

it knew of and suppressed prior to trial – is a significant issue for which there is abundant legal support. The district court's failure to even afford *de novo* review of the exclusion of the issue from this case in itself warrants the grant of a COA. *See* DE:40, Ex. 10 (first mention of Ochoa in connection with Bernal's; discovery requests begin at this point); DE:54 (Ochoa's motion for discovery, argues at length for production of evidence relating to the apparent hiding of Bernal's 9/11 claims). DE:72:9-11, 22-25, 28, 34-35, 38-39 (argument at motion hearing before magistrate judge; Ochoa's counsel makes repeated reference to the importance of full discovery as to the 9/11 issue, and issue that all parties at that time treated as part of the case).

    (c)    *Government's attempt to minimize Bernal's sworn declarations that consistently explained how he gave erroneous testimony and withheld material evidence.*

The government repeats its use of the term "recantation" to address multiple sworn statements by Bernal containing: non-cumulative information regarding Bernal's dealings with the government; information regarding 9/11 claims that the government ultimately acknowledged was consistent with their records; information regarding government coaching as to testimony to support U.S. jurisdiction; and admissions by Bernal regarding fabricating pieces of evidence to make the government's case more tenable. Gov't Resp. 9. But the most important element of the Bernal revelations is that he was unbalanced when the government first met him

18

and that he had to be managed to give only plausible testimony that would hurt Ochoa.

That revelation is more than a mere recantation, and it had much greater indicia of reliability than the type of document ordinarily thought of as a recantation: i.e., a witness who identifies the defendant as the culprit and later says their entire inculpatory claim was false, in an affidavit filed to help the convicted defendant. This was not that situation. Bernal did not mean his letters of complaint to the government to be given to or used by Ochoa. Bernal did not retract his claims that Ochoa was the mastermind of 9/11 and was a major drug trafficker. Bernal did not retract even his claims of identifying Ochoa's voice on recordings. But Bernal did admit that the jurisdictional evidence he was coached to present was false and that there was nothing to lead Ochoa to believe that he was dealing with an importation to the United States. Further, he admitted that the agents had effectively silenced him from discussing what appear to be unbelievable and irrational claims about the 9/11 attack, so as to keep him from being destroyed on the witness stand and rendered useless in the case against Ochoa. That was not any form of recantation, but a revelation of the government's suppression of critically important evidence of Bernal's instability.

And while Bernal admitted that his trial testimony about seeing the taping equipment – to which he had committed to testifying, while he was still in Colombian

custody, so as to give his testimony about the tapes a greater ring of credibility and to avoid any potential suppression issue the government might face if it had been shown that Colombian agents actually placed the microphone inside Bernal's office – that admission revealed more about the undisclosed nature of his dealings with the government and why he believed government assurances of special immigration help for his family; thus the incidental elements of "recantation" only bolstered Ochoa's § 2255 claim, because Bernal did not, in his mind, exonerate Ochoa, but rather merely told the whole truth about how he was handled in a way to establish U.S. jurisdiction, validate the wiretapping/bugging of the office, set himself up as an authority on the tape recordings, and hide elements of his mental instability, his wild conspiracy theories and hate for Ochoa, and his overall willingness to shape and change his story to please the government.   Outright rejection of Bernal's largely confirmed revelations by treating them as a mere recantation does nothing but protect the government from a whistleblower, including one who, like Bernal, who still thought he was on the government's side.

The government's reference to Bernal's making of a 'recanted recantation' lacks record support. The government simply takes an apology by Bernal that the unintended release of private letters he sent to the prosecutor had caused the government embarrassment and calls it a recantation.   Imaginative recasting of

Bernal's statement that he did not intend his letter to be made public as a recantation of factual assertions made in the letter to the prosecutor is simply meritless. Bernal's letter of September 20, 2007 does not retract a single word of his May 28, 2007 letter to the government and does not deviate from his much earlier complaints to his own lawyer about the same facts. DE:10-2:3; DE:52-1 (August 28, 2003 Bernal letter to counsel stating privately to *his own lawyer* that he had committed perjury for the government and deserved to get what the government promised about protecting his family).

(d)    *Government understates Bernal's importance to proof of the jurisdictional element.*

The government's response to Ochoa's jurisdictional arguments are both factually and legally misplaced. *See* Gov't Resp. 12. The government, in stating five supposed factors showing U.S. jurisdiction, mistakenly relies on the "Sony Route" that did not involve Ochoa, according the government's admissions in closing argument. CrDE:1606:15 (government tells jury: "the defendant is not in the shipment of 125 kilos hidden in pumpkins"). That this abandoned theory has returned to become the linchpin of the government's claim for jurisdiction shows the absence of a government case on intent to import to the United States. The reference to the Sony route is doubly problematic for the government, because not only did the

21

government abandon that theory at trial, but Bernal, in his post-conviction letters, admitted that he had lied about his own involvement in that route in order to support the false testimony of government witness Londono. *See* DE:34; DE:40, Ex. 10 (Bernal's letter of March 24, 2008 at 9, admitting the lie and why he sought to bolster Londono's battered credibility).

Regarding the government's remaining claims to support jurisdiction, they rest on speculation where there was no evidence that Ochoa knew what retransport if any would be done with drugs shipped to Mexico and where no evidence, apart from what Bernal was coached to give and which he later disavowed, showed awareness of some form of post-delivery transshipment plan by the Mexican purchaser. The three other factors noted by the government to show U.S. jurisdiction are, at best, ambiguous: Londono's uncorroborated claim that he once received $150,000 (CrDE:1415:29-32) was unaccompanied by any claim that those funds came from an importation to the United States; Leo Arreguin's testimony that much of the cocaine going to Mexico goes to the United States did not show anything about the cocaine in this case; and that Ochoa had been involved in drug trafficking in the early years of direct cocaine shipments to the United States, ***30 years ago***, did not show what he knew about the business of the Mexican purchaser of the Bernal cocaine. *See* Gov't Resp. 12 (relying on possibilities such as the use of dollar currency to speculate as to the destination of drugs that might have gone anywhere – east to Asia, west to Europe, or north to

22

Canada or the United States – or might have stayed in Central America, but were by no means necessarily headed for the United States).[9]

    (e)    *Fundamental nature of the government's manipulation of the Bernal problems under longstanding Supreme Court precedent.*

The government fails to discuss any of the evidence of Bernal's mental instability and the measures the government undertook to shield it from disclosure, including secretly providing psychological care to Bernal during his trial testimony, when he expressed suicidal ideations.  DE:1-2:22-23 (Bernal's admission of the events during trial).  And the government fails to address Ochoa's citation of *Mesarosh v. United States*, 352 U.S. 1, 4, 77 S.Ct. 1, 2 (1956), the dispositive facts of which are remarkably similar to Ochoa's in that post-trial disclosure of terrorism fantasies and perjury was found by the Supreme Court to require an evidentiary hearing.

In *Mesarosh*, the Supreme Court recognized that where a key witness's delusions relating to the subject matter of the case come to light, a hearing on the matter is the ***minimal*** relief that should be afforded.  *Id*. at 13-14 (relief was required "even though the judge might believe that Mazzei's bizarre testimony in 1956

---

    [9]  The government cites CrDE:1576:20 as relating to evidence of intent to ship to the United States.  But review of that transcript shows the testimony of Fredy Ochoa regarding another drug group, the Arcadia Group, that the government did not seek to link to *Fabio* Ochoa.

concerning plans for the assassination of other officials, the destruction of bridges,

training in sabotage and handling arms, and the poisoning of water in reservoirs, all

to destroy the Government of the United States, was the product of a mental or

emotional condition that had developed only *after* the time of this trial") (emphasis

added).   Evidence of the Bernal delusions regarding Ochoa existed *and was*

*suppressed by the government* in the *pretrial* period.   The similarities between

Bernal's delusions regarding Ochoa and the events of 9/11 and the terrorism

delusions of the chief witness in *Mesarosh* are unmistakable.   The government's

failure to even discuss *Mesarosh* is telling: to deny that a debatable issue is raised is

to blink reality, with the government no longer seeking to maintain its initial § 2255

response implying that Bernal is only *now* delusional. The *Mesarosh* grounds for an

evidentiary hearing or greater relief are even stronger in Ochoa's case, with pretrial

delusions animating Bernal's testimony, government suppression of that mental state

while controlling the witness's testimony, and then when subsequent revelations of

Bernal's reasons for testifying as he did arose, the government asserted post-trial

mental health issues.  *See, e.g., United States v. Espinosa-Hernandez,* 918 F.2d 911,

913 (11th Cir. 1990) (newly-discovered evidence as to questionable conduct and

misstatements by government witness, including suppression of evidence as to

informant, detracted from integrity of proceedings, thus compelling discovery and

24

evidentiary hearing "to 'remove the taint' from Espinosa's conviction").

The effect of foreclosing evidentiary development, barring *de novo* review of the magistrate judge's decisions, precluding essential supplementation of the record and of the claims regarding Bernal, and denying an evidentiary hearing was to unfairly deprive Ochoa of a fair opportunity to litigate his claims. The government's assertion that these procedural failings in the district court's handling of the § 2255 claims cannot be reviewed – and the government's complete failure to offer any support for the district court's erroneous rulings denying the movant the procedural protections guaranteed by statute – compel that a COA be granted. The government's inability to defend the rulings is the clearest indication that they are subject to dispute among reasonable jurists.

The government fails to acknowledge that the discussion in *Slack v. McDaniel*, 529 U.S. 473, 484, 120 S.Ct. 1595 (2000), regarding issuance of procedural COA does not limit, much less bar, review of erroneous procedural rulings that contribute to merits decision on a § 2255 motion. This Court should readily reject the government's argument that the district court's decision to bar supplementation or amendment of a 2255 claim – particularly on the theory that the supplementation was untimely – is not reviewable. The government's contention is refuted by case law. *See United States v. Dodd*, 614 F.3d 512, 518 (8th Cir. 2010) (approving grant of COA on question of denial of leave to supplement/amend § 2255 claim; holding that

district court erred in failing to address amended claim on theory that the claim was untimely and did not relate back to the original claims, where claim of failure to object to government witnesses' testimony encompassed argument that counsel should have objected to speculative nature of testimony; noting that apart from the timeliness issue, the appellate court need only determine that "Dodd's surviving ineffective assistance claim raises [an issue] that will require a review of the lengthy record and the remaining evidence. It is not a claim that we can say fails as a matter of law.").

The district court erred in denying the well-founded claim for supplementation of the amended § 2255 motion to include the government's suppression of evidence regarding Bernal's delusional assertions attributing the 9/11 attack to movant Ochoa. The government simply states, in *ipse dixit* fashion, that this supplementation of the existing claims regarding government suppression of material evidence pertaining to Bernal was "untimely." Gov't Resp. 5, 6, 9 n. 7. But the government's contention that this Court is barred from even considering whether to grant a COA on the question of the district court's erroneous denial of claim supplementation – an argument that the government also erroneously maintained in the district court – fails in light of *Dodd*.

This Court should reject the government's unsupported contention that the merits of the ruling denying consideration of the supplemented claim did not even

have to be addressed as part of the denial of § 2255 relief or in the COA process. Clearly, under *Clisby*, procedural rulings that underlie merits denials are part and parcel of the permissible subject matter of review of the order denying § 2255 relief. Appellate relief cannot be foreclosed simply because the district court erroneously fails to consider the entire record, excludes properly amended and supplemented claims, or denies to the movant access to essential evidence supporting the claims.

In *Long v. United States*, 626 F.3d 1167, 1169-70 (11th Cir. 2010), this Court concluded that "in a post-conviction case, the district court must develop a record sufficient to facilitate appellate review of all issues pertinent to an application for a certificate of appealability (COA) and, by extension, the ultimate merit of any issues for which a COA is granted." *See id.* (rejecting government's "misreading" of *Clisby v. Jones*, 960 F.2d 925 (11th Cir.1992); "*Clisby* did not address a petition that was dismissed without examination of the merits. Rather, it was decided in the context of a petition that had been denied on the merits, *but with not all of the claims being addressed in the district court's ruling*."; rejecting government argument that "timeliness claims should be excluded from the rule" in *Clisby*; remanding to district court to further address the denial of a claim due to untimeliness).

Similarly, the Fourth Circuit recently held that a denial of record expansion not only warranted the grant of a COA, but merited reversal of the denial of § 2255 relief. *See United States v. MacDonald*, 641 F.3d 596, 612-14 (4th Cir. 2011) (granting

27

COA as to procedural issue, where district court denied habeas claim on the merits, holding that district court should not have prohibited expansion of record to include evidence received after trial and after the filing of the motion)

The government needlessly criticizes the movant for making reference to the COA standard for procedural errors as focusing on the merits of the procedural ruling rather than the ultimate merits of the claim, but it is clear that when a procedural ruling is at issue, affecting the content of the record under consideration by the district court, appellate courts state the analysis as movant did in his motion. *See Johnson v. Thaler*, 406 Fed.Appx. 882 (5th Cir. 2010) (question for review authorization is whether "jurists of reason could find it debatable whether the district court committed a substantive or procedural error in dismissing his habeas application").  The issues for the present case are whether it is *debatable* that the procedural rulings that underlie the merits decision in Ochoa's case were correct – i.e., whether judges could disagree about the issue of record or claim supplementation, denial of discovery, improper handling of the magistrate judge referral to the movant's prejudice, and denial of an evidentiary hearing – where the motion set forth potentially meritorious constitutional claims.

## CONCLUSION

WHEREFORE, for the reasons advanced herein and in his prior pleadings and

in the interest of justice, Movant Fabio Ochoa requests that the Court grant his motion

for certificate of appealability.

Respectfully submitted,


  s/ Richard C. Klugh                           s/ Todd C. Scher                          
RICHARD C. KLUGH, ESQ.          TODD G. SCHER, ESQ.
Counsel for Appellant                   Counsel for Appellant
Ingraham Building                        Law Office of Todd G. Scher, P.L.
25 S.E. 2nd Avenue, Suite 1105    398 E. Dania Beach Boulevard Suite 300
Miami, Florida 33131                   Dania Beach, Florida 33004
Tel. No. (305) 536-1191              Tel. No. (754) 263-2349

## CERTIFICATE OF COMPLIANCE

I CERTIFY that this motion complies with the type-volume limitation of FED. R. APP. P. 32(a)(7). According to the WordPerfect program on which it is written, the numbered pages of this brief contain 6,755 words.

 s/  Richard C. Klugh                              
Richard C. Klugh

## CERTIFICATE OF SERVICE

I CERTIFY that a copy of the foregoing unopposed motion for certificate of appealability was filed with the Clerk electronically this 12th day of   July  , 2012, and served via e-mail upon Emily Smachetti, United States Attorney's Office, 99 N.E. Fourth Street, Miami, Florida 33132.

 s/ Richard C. Klugh                          
Richard C. Klugh

30